(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## OHIO *v.* CLARK

CERTIORARI TO THE SUPREME COURT OF OHIO

No. 13–1352.   Argued March 2, 2015—Decided June 18, 2015

Respondent Darius Clark sent his girlfriend away to engage in prostitution while he cared for her 3-year-old son L. P. and 18-month-old daughter A. T.  When L. P.'s preschool teachers noticed marks on his body, he identified Clark as his abuser.  Clark was subsequently tried on multiple counts related to the abuse of both children.  At trial, the State introduced L. P.'s statements to his teachers as evidence of Clark's guilt, but L. P. did not testify.  The trial court denied Clark's motion to exclude the statements under the Sixth Amendment's Confrontation Clause.  A jury convicted Clark on all but one count.  The state appellate court reversed the conviction on Confrontation Clause grounds, and the Supreme Court of Ohio affirmed.

*Held*: The introduction of L. P.'s statements at trial did not violate the Confrontation Clause.  Pp. 4–12.

   (a) This Court's decision in *Crawford* v. *Washington*, 541 U. S. 36, 54, held that the Confrontation Clause generally prohibits the introduction of "testimonial" statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination."   A statement qualifies as testimonial if the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony." *Michigan* v. *Bryant*, 562 U. S. 344, 369.  In making that "primary purpose" determination, courts must consider "all of the relevant circumstances." *Ibid.*  "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.,* at 359.  But that does not mean that the Confrontation Clause bars every statement that satisfies the "primary purpose" test.  The Court has recognized that the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the

Syllabus

time of the founding. See *Giles* v. *California*, 554 U. S. 353, 358–359; *Crawford*, 541 U. S., at 56, n. 6, 62. Thus, the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause. Pp. 4–7.

(b) Considering all the relevant circumstances, L. P.'s statements were not testimonial. L. P.'s statements were not made with the primary purpose of creating evidence for Clark's prosecution. They occurred in the context of an ongoing emergency involving suspected child abuse. L. P.'s teachers asked questions aimed at identifying and ending a threat. They did not inform the child that his answers would be used to arrest or punish his abuser. L. P. never hinted that he intended his statements to be used by the police or prosecutors. And the conversation was informal and spontaneous. L. P.'s age further confirms that the statements in question were not testimonial because statements by very young children will rarely, if ever, implicate the Confrontation Clause. As a historical matter, moreover, there is strong evidence that statements made in circumstances like these were regularly admitted at common law. Finally, although statements to individuals other than law enforcement officers are not categorically outside the Sixth Amendment's reach, the fact that L. P. was speaking to his teachers is highly relevant. Statements to individuals who are not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than those given to law enforcement officers. Pp. 7–10.

(c) Clark's arguments to the contrary are unpersuasive. Mandatory reporting obligations do not convert a conversation between a concerned teacher and her student into a law enforcement mission aimed at gathering evidence for prosecution. It is irrelevant that the teachers' questions and their duty to report the matter had the natural tendency to result in Clark's prosecution. And this Court's Confrontation Clause decisions do not determine whether a statement is testimonial by examining whether a jury would view the statement as the equivalent of in-court testimony. Instead, the test is whether a statement was given with the "primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, *supra*, at 358. Here, the answer is clear: L. P.'s statements to his teachers were not testimonial. Pp. 11–12.

137 Ohio St. 3d 346, 2013–Ohio–4731, 999 N. E. 2d 592, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which GINSBURG, J., joined. THOMAS, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–1352

———————

## OHIO, PETITIONER *v.* DARIUS CLARK

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF OHIO

[June 18, 2015]

JUSTICE ALITO delivered the opinion of the Court.

Darius Clark sent his girlfriend hundreds of miles away to engage in prostitution and agreed to care for her two young children while she was out of town. A day later, teachers discovered red marks on her 3-year-old son, and the boy identified Clark as his abuser. The question in this case is whether the Sixth Amendment's Confrontation Clause prohibited prosecutors from introducing those statements when the child was not available to be cross-examined. Because neither the child nor his teachers had the primary purpose of assisting in Clark's prosecution, the child's statements do not implicate the Confrontation Clause and therefore were admissible at trial.

I

Darius Clark, who went by the nickname "Dee," lived in Cleveland, Ohio, with his girlfriend, T. T., and her two children: L. P., a 3-year-old boy, and A. T., an 18-month-old girl.[1] Clark was also T. T.'s pimp, and he would regularly send her on trips to Washington, D. C., to work as a prostitute. In March 2010, T. T. went on one such trip,

———————

[1] Like the Ohio courts, we identify Clark's victims and their mother by their initials.

and she left the children in Clark's care.

The next day, Clark took L. P. to preschool. In the lunchroom, one of L. P.'s teachers, Ramona Whitley, observed that L. P.'s left eye appeared bloodshot. She asked him "'[w]hat happened,'" and he initially said nothing. 137 Ohio St. 3d 346, 347, 2013–Ohio–4731, 999 N. E. 2d 592, 594. Eventually, however, he told the teacher that he "'fell.'" *Ibid.* When they moved into the brighter lights of a classroom, Whitley noticed "'[r]ed marks, like whips of some sort,'" on L. P.'s face. *Ibid.* She notified the lead teacher, Debra Jones, who asked L. P., "'Who did this? What happened to you?'" *Id.,* at 348, 999 N. E. 2d, at 595. According to Jones, L. P. "'seemed kind of bewildered'" and "'said something like, Dee, Dee.'" *Ibid.* Jones asked L. P. whether Dee is "big or little," to which L. P. responded that "Dee is big." App. 60, 64. Jones then brought L. P. to her supervisor, who lifted the boy's shirt, revealing more injuries. Whitley called a child abuse hotline to alert authorities about the suspected abuse.

When Clark later arrived at the school, he denied responsibility for the injuries and quickly left with L. P. The next day, a social worker found the children at Clark's mother's house and took them to a hospital, where a physician discovered additional injuries suggesting child abuse. L. P. had a black eye, belt marks on his back and stomach, and bruises all over his body. A. T. had two black eyes, a swollen hand, and a large burn on her cheek, and two pigtails had been ripped out at the roots of her hair.

A grand jury indicted Clark on five counts of felonious assault (four related to A. T. and one related to L. P.), two counts of endangering children (one for each child), and two counts of domestic violence (one for each child). At trial, the State introduced L. P.'s statements to his teachers as evidence of Clark's guilt, but L. P. did not testify. Under Ohio law, children younger than 10 years old are

incompetent to testify if they "appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Ohio Rule Evid. 601(A) (Lexis 2010). After conducting a hearing, the trial court concluded that L. P. was not competent to testify. But under Ohio Rule of Evidence 807, which allows the admission of reliable hearsay by child abuse victims, the court ruled that L. P.'s statements to his teachers bore sufficient guarantees of trustworthiness to be admitted as evidence.

Clark moved to exclude testimony about L. P.'s out-of-court statements under the Confrontation Clause. The trial court denied the motion, ruling that L. P.'s responses were not testimonial statements covered by the Sixth Amendment. The jury found Clark guilty on all counts except for one assault count related to A. T., and it sentenced him to 28 years' imprisonment. Clark appealed his conviction, and a state appellate court reversed on the ground that the introduction of L. P.'s out-of-court statements violated the Confrontation Clause.

In a 4-to-3 decision, the Supreme Court of Ohio affirmed. It held that, under this Court's Confrontation Clause decisions, L. P.'s statements qualified as testimonial because the primary purpose of the teachers' questioning "was not to deal with an existing emergency but rather to gather evidence potentially relevant to a subsequent criminal prosecution." 137 Ohio St. 3d, at 350, 999 N. E. 2d, at 597. The court noted that Ohio has a "mandatory reporting" law that requires certain professionals, including preschool teachers, to report suspected child abuse to government authorities. See *id.,* at 349–350, 999 N. E. 2d, at 596–597. In the court's view, the teachers acted as agents of the State under the mandatory reporting law and "sought facts concerning past criminal activity to identify the person responsible, eliciting statements that 'are functionally identical to live, in-court testimony,

doing precisely what a witness does on direct examination.'" *Id.,* at 355, 999 N. E. 2d, at 600 (quoting *Melendez-Diaz* v. *Massachusetts*, 557 U. S. 305, 310–311 (2009); some internal quotation marks omitted).

We granted certiorari, 573 U. S. ___ (2014), and we now reverse.

## II
### A

The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Ohio* v. *Roberts*, 448 U. S. 56, 66 (1980), we interpreted the Clause to permit the admission of out-of-court statements by an unavailable witness, so long as the statements bore "adequate 'indicia of reliability.'" Such indicia are present, we held, if "the evidence falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *Ibid.*

In *Crawford* v. *Washington*, 541 U. S. 36 (2004), we adopted a different approach. We explained that "witnesses," under the Confrontation Clause, are those "who bear testimony," and we defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.,* at 51 (internal quotation marks and alteration omitted). The Sixth Amendment, we concluded, prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.,* at 54. Applying that definition to the facts in *Crawford*, we held that statements by a witness during police questioning at the station house were testimonial and thus could not be admitted. But our decision in *Crawford* did not offer an exhaustive definition of "testimonial" statements.

Instead, *Crawford* stated that the label "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.,* at 68.

Our more recent cases have labored to flesh out what it means for a statement to be "testimonial." In *Davis* v. *Washington* and *Hammon* v. *Indiana*, 547 U. S. 813 (2006), which we decided together, we dealt with statements given to law enforcement officers by the victims of domestic abuse. The victim in *Davis* made statements to a 911 emergency operator during and shortly after her boyfriend's violent attack. In *Hammon*, the victim, after being isolated from her abusive husband, made statements to police that were memorialized in a "'battery affidavit.'" *Id.,* at 820.

We held that the statements in *Hammon* were testimonial, while the statements in *Davis* were not. Announcing what has come to be known as the "primary purpose" test, we explained: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.,* at 822. Because the cases involved statements to law enforcement officers, we reserved the question whether similar statements to individuals other than law enforcement officers would raise similar issues under the Confrontation Clause. See *id.,* at 823, n. 2.

In *Michigan* v. *Bryant*, 562 U. S. 344 (2011), we further expounded on the primary purpose test. The inquiry, we emphasized, must consider "all of the relevant circumstances." *Id.,* at 369. And we reiterated our view in *Davis*

that, when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause." 562 U. S., at 358. At the same time, we noted that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Ibid.* "[T]he existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry." *Id.,* at 374. Instead, "whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.,* at 366.

One additional factor is "the informality of the situation and the interrogation." *Id.,* at 377. A "formal station-house interrogation," like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused. *Id.,* at 366, 377. And in determining whether a statement is testimonial, "standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Id.,* at 358–359. In the end, the question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony." *Id.,* at 358. Applying these principles in *Bryant*, we held that the statements made by a dying victim about his assailant were not testimonial because the circumstances objectively indicated that the conversation was primarily aimed at quelling an ongoing emergency, not establishing evidence for the prosecution. Because the relevant statements were made to law enforcement officers, we again declined to decide whether the same analysis applies to statements made to individuals other than the police. See *id.,* at 357, n. 3.

Thus, under our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.,* at 359. But that does not mean that the Confrontation Clause bars every statement that satisfies the "primary purpose" test. We have recognized that the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding. See *Giles* v. *California*, 554 U. S. 353, 358–359 (2008); *Crawford*, 541 U. S., at 56, n. 6, 62. Thus, the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause.

B

In this case, we consider statements made to preschool teachers, not the police. We are therefore presented with the question we have repeatedly reserved: whether statements to persons other than law enforcement officers are subject to the Confrontation Clause. Because at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns, we decline to adopt a categorical rule excluding them from the Sixth Amendment's reach. Nevertheless, such statements are much less likely to be testimonial than statements to law enforcement officers. And considering all the relevant circumstances here, L. P.'s statements clearly were not made with the primary purpose of creating evidence for Clark's prosecution. Thus, their introduction at trial did not violate the Confrontation Clause.

L. P.'s statements occurred in the context of an ongoing emergency involving suspected child abuse. When L. P.'s

teachers noticed his injuries, they rightly became worried that the 3-year-old was the victim of serious violence. Because the teachers needed to know whether it was safe to release L. P. to his guardian at the end of the day, they needed to determine who might be abusing the child.[2] Thus, the immediate concern was to protect a vulnerable child who needed help. Our holding in *Bryant* is instructive. As in *Bryant*, the emergency in this case was ongoing, and the circumstances were not entirely clear. L. P.'s teachers were not sure who had abused him or how best to secure his safety. Nor were they sure whether any other children might be at risk. As a result, their questions and L. P.'s answers were primarily aimed at identifying and ending the threat. Though not as harried, the conversation here was also similar to the 911 call in *Davis*. The teachers' questions were meant to identify the abuser in order to protect the victim from future attacks. Whether the teachers thought that this would be done by apprehending the abuser or by some other means is irrelevant. And the circumstances in this case were unlike the interrogation in *Hammon*, where the police knew the identity of the assailant and questioned the victim after shielding her from potential harm.

There is no indication that the primary purpose of the conversation was to gather evidence for Clark's prosecution. On the contrary, it is clear that the first objective was to protect L. P. At no point did the teachers inform L. P. that his answers would be used to arrest or punish his abuser. L. P. never hinted that he intended his statements to be used by the police or prosecutors. And the

_____

[2] In fact, the teachers and a social worker who had come to the school *were* reluctant to release L. P. into Clark's care after the boy identified Clark as his abuser. But after a brief "stare-down" with the social worker, Clark bolted out the door with L. P., and social services were not able to locate the children until the next day. App. 92–102, 150–151.

conversation between L. P. and his teachers was informal and spontaneous. The teachers asked L. P. about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely as any concerned citizen would talk to a child who might be the victim of abuse. This was nothing like the formalized station-house questioning in *Crawford* or the police interrogation and battery affidavit in *Hammon.*

L. P.'s age fortifies our conclusion that the statements in question were not testimonial. Statements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details of our criminal justice system. Rather, "[r]esearch on children's understanding of the legal system finds that" young children "have little understanding of prosecution." Brief for American Professional Society on the Abuse of Children as *Amicus Curiae* 7, and n. 5 (collecting sources). And Clark does not dispute those findings. Thus, it is extremely unlikely that a 3-year-old child in L. P.'s position would intend his statements to be a substitute for trial testimony. On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all.

As a historical matter, moreover, there is strong evidence that statements made in circumstances similar to those facing L. P. and his teachers were admissible at common law. See Lyon & LaMagna, The History of Children's Hearsay: From Old Bailey to Post-*Davis*, 82 Ind. L. J. 1029, 1030 (2007); see also *id.,* at 1041–1044 (examining child rape cases from 1687 to 1788); J. Langbein, The Origins of Adversary Criminal Trial 239 (2003) ("The Old Bailey" court in 18th-century London "tolerated flagrant hearsay in rape prosecutions involving a child victim who was not competent to testify because she was too

young to appreciate the significance of her oath"). And when 18th-century courts excluded statements of this sort, see, *e.g., King* v. *Brasier*, 1 Leach 199, 168 Eng. Rep. 202 (K. B. 1779), they appeared to do so because the child should have been ruled competent to testify, not because the statements were otherwise inadmissible. See Lyon & LaMagna, *supra*, at 1053–1054. It is thus highly doubtful that statements like L. P.'s ever would have been understood to raise Confrontation Clause concerns. Neither *Crawford* nor any of the cases that it has produced has mounted evidence that the adoption of the Confrontation Clause was understood to require the exclusion of evidence that was regularly admitted in criminal cases at the time of the founding. Certainly, the statements in this case are nothing like the notorious use of *ex parte* examination in Sir Walter Raleigh's trial for treason, which we have frequently identified as "the principal evil at which the Confrontation Clause was directed." *Crawford*, 541 U. S., at 50; see also *Bryant*, 562 U. S., at 358.

Finally, although we decline to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment, the fact that L. P. was speaking to his teachers remains highly relevant. Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. See *id.*, at 369. Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. See, *e.g., Giles*, 554 U. S., at 376. It is common sense that the relationship between a student and his teacher is very different from that between a citizen and the police. We do not ignore that reality. In light of these circumstances, the Sixth Amendment did not prohibit the State from introducing L. P.'s statements at trial.

### III

Clark's efforts to avoid this conclusion are all off-base. He emphasizes Ohio's mandatory reporting obligations, in an attempt to equate L. P.'s teachers with the police and their caring questions with official interrogations. But the comparison is inapt. The teachers' pressing concern was to protect L. P. and remove him from harm's way. Like all good teachers, they undoubtedly would have acted with the same purpose whether or not they had a state-law duty to report abuse. And mandatory reporting statutes alone cannot convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution.

It is irrelevant that the teachers' questions and their duty to report the matter had the natural tendency to result in Clark's prosecution. The statements at issue in *Davis* and *Bryant* supported the defendants' convictions, and the police always have an obligation to ask questions to resolve ongoing emergencies. Yet, we held in those cases that the Confrontation Clause did not prohibit introduction of the statements because they were not primarily intended to be testimonial. Thus, Clark is also wrong to suggest that admitting L. P.'s statements would be fundamentally unfair given that Ohio law does not allow incompetent children to testify. In any Confrontation Clause case, the individual who provided the out-of-court statement is not available as an in-court witness, but the testimony is admissible under an exception to the hearsay rules and is probative of the defendant's guilt. The fact that the witness is unavailable because of a different rule of evidence does not change our analysis.

Finally, Clark asks us to shift our focus from the context of L. P.'s conversation with his teachers to the jury's perception of those statements. Because, in his view, the "jury treated L. P.'s accusation as the functional equivalent of testimony," Clark argues that we must prohibit its

introduction.  Brief for Respondent 42.  Our Confrontation Clause decisions, however, do not determine whether a statement is testimonial by examining whether a jury would view the statement as the equivalent of in-court testimony.  The logic of this argument, moreover, would lead to the conclusion that virtually all out-of-court statements offered by the prosecution are testimonial.  The prosecution is unlikely to offer out-of-court statements unless they tend to support the defendant's guilt, and all such statements could be viewed as a substitute for in-court testimony.  We have never suggested, however, that the Confrontation Clause bars the introduction of all out-of-court statements that support the prosecution's case.  Instead, we ask whether a statement was given with the "primary purpose of creating an out-of-court substitute for trial testimony."  *Bryant*, *supra*, at 358.  Here, the answer is clear: L. P.'s statements to his teachers were not testimonial.

IV

We reverse the judgment of the Supreme Court of Ohio and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–1352

OHIO, PETITIONER *v.* DARIUS CLARK

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF OHIO

[June 18, 2015]

JUSTICE SCALIA, with whom JUSTICE GINSBURG joins, concurring in the judgment.

I agree with the Court's holding, and with its refusal to decide two questions quite unnecessary to that holding: what effect Ohio's mandatory-reporting law has in transforming a private party into a state actor for Confrontation Clause purposes, and whether a more permissive Confrontation Clause test—one less likely to hold the statements testimonial—should apply to interrogations by private actors. The statements here would not be testimonial under the usual test applicable to informal police interrogation.

L. P.'s primary purpose here was certainly not to invoke the coercive machinery of the State against Clark. His age refutes the notion that he is capable of forming such a purpose. At common law, young children were generally considered incompetent to take oaths, and were therefore unavailable as witnesses unless the court determined the individual child to be competent. Lyon & LaManga, The History of Children's Hearsay: From Old Bailey to Post-*Davis*, 82 Ind. L. J. 1029, 1030-1031 (2007). The inconsistency of L. P.'s answers—making him incompetent to testify here—is hardly unusual for a child of his age. And

the circumstances of L. P.'s statements objectively indicate that even if he could, as an abstract matter, form such a purpose, he did not. Nor did the teachers have the primary purpose of establishing facts for later prosecution. Instead, they sought to ensure that they did not deliver an abused child back into imminent harm. Nor did the conversation have the requisite solemnity necessary for testimonial statements. A 3-year-old was asked questions by his teachers at school. That is far from the surroundings adequate to impress upon a declarant the importance of what he is testifying to.

That is all that is necessary to decide the case, and all that today's judgment holds.

I write separately, however, to protest the Court's shoveling of fresh dirt upon the Sixth Amendment right of confrontation so recently rescued from the grave in *Crawford* v. *Washington*, 541 U. S. 36 (2004). For several decades before that case, we had been allowing hearsay statements to be admitted against a criminal defendant if they bore "'indicia of reliability.'" *Ohio* v. *Roberts*, 448 U. S. 56, 66 (1980). Prosecutors, past and present, love that flabby test. *Crawford* sought to bring our application of the Confrontation Clause back to its original meaning, which was to exclude unconfronted statements made by *witnesses—i.e.,* statements that were *testimonial.* 541 U. S., at 51. We defined testimony as a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" *ibid.*—in the context of the Confrontation Clause, a fact "potentially relevant to later criminal prosecution," *Davis* v. *Washington*, 547 U. S. 813, 822 (2006).

*Crawford* remains the law. But when else has the categorical overruling, the thorough repudiation, of an earlier line of cases been described as nothing more than "adopt[ing] a different approach," *ante,* at 4—as though *Crawford* is only a matter of twiddle-dum twiddle-dee

preference, and the old, pre-*Crawford* "approach" remains available? The author unabashedly displays his hostility to *Crawford* and its progeny, perhaps aggravated by inability to muster the votes to overrule them. *Crawford* "does not rank on the [author of the opinion's] top-ten list of favorite precedents—and . . . the [author] could not restrain [himself] from saying (and saying and saying) so." *Harris* v. *Quinn*, 573 U. S. \_\_\_, \_\_\_ (2014) (KAGAN, J., dissenting) (slip op., at 15).

But snide detractions do no harm; they are just indications of motive. Dicta on legal points, however, can do harm, because though they are not binding they can mislead. Take, for example, the opinion's statement that the primary-purpose test is merely *one* of several heretofore unmentioned conditions ("necessary, but not always sufficient") that must be satisfied before the Clause's protections apply. *Ante,* at 7. That is absolutely false, and has no support in our opinions. The Confrontation Clause categorically entitles a defendant *to be confronted with the witnesses against him*; and the primary-purpose test sorts out, among the many people who interact with the police informally, *who is acting as a witness and who is not.* Those who fall into the former category bear testimony, and are therefore acting as "witnesses," subject to the right of confrontation. There are no other mysterious requirements that the Court declines to name.

The opinion asserts that future defendants, and future Confrontation Clause majorities, must provide "evidence that the adoption of the Confrontation Clause was understood to require the exclusion of evidence that was regularly admitted in criminal cases at the time of the founding." *Ante*, at 10. This dictum gets the burden precisely backwards—which is of course precisely the idea. Defendants may invoke their Confrontation Clause rights once they have established that the state seeks to introduce testimonial evidence against them in a criminal case

without unavailability of the witness and a previous op-
portunity to cross-examine.  The burden is upon the prose-
cutor who seeks to introduce evidence *over* this bar to
prove a long-established practice of introducing *specific*
kinds of evidence, such as dying declarations, *see Craw-
ford*, *supra,* at 56, n. 6, for which cross-examination was
not typically necessary.  A suspicious mind (or even one
that is merely not naïve) might regard this distortion as
the first step in an attempt to smuggle longstanding hear-
say exceptions back into the Confrontation Clause—in
other words, an attempt to return to *Ohio* v. *Roberts*.

But the good news is that there are evidently not the
votes to return to that halcyon era for prosecutors; and
that dicta, even calculated dicta, are nothing but dicta.
They are enough, however, combined with the peculiar
phenomenon of a Supreme Court opinion's aggressive
hostility to precedent that it purports to be applying, to
prevent my joining the writing for the Court.  I concur
only in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1352

_____

## OHIO, PETITIONER *v.* DARIUS CLARK

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF OHIO

[June 18, 2015]

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that Ohio mandatory reporters are not agents of law enforcement, that statements made to private persons or by very young children will rarely implicate the Confrontation Clause, and that the admission of the statements at issue here did not implicate that constitutional provision. I nonetheless cannot join the majority's analysis. In the decade since we first sought to return to the original meaning of the Confrontation Clause, see *Crawford* v. *Washington*, 541 U. S. 36 (2004), we have carefully reserved consideration of that Clause's application to statements made to private persons for a case in which it was squarely presented. See, *e.g., Michigan* v. *Bryant*, 562 U. S. 344, 357, n. 3 (2011).

This is that case; yet the majority does not offer clear guidance on the subject, declaring only that "the primary purpose test is a necessary, but not always sufficient, condition" for a statement to fall within the scope of the Confrontation Clause. *Ante,* at 7. The primary purpose test, however, is just as much "an exercise in fiction . . . disconnected from history" for statements made to private persons as it is for statements made to agents of law enforcement, if not more so. See *Bryant*, *supra,* at 379 (THOMAS, J., concurring in judgment) (internal quotation marks omitted). I would not apply it here. Nor would I leave the resolution of this important question in doubt.

Instead, I would use the same test for statements to

private persons that I have employed for statements to agents of law enforcement, assessing whether those statements bear sufficient indicia of solemnity to qualify as testimonial. See *Crawford, supra,* at 51; *Davis* v. *Washington*, 547 U. S. 813, 836–837 (2006) (THOMAS, J., concurring in judgment in part and dissenting in part). This test is grounded in the history of the common-law right to confrontation, which "developed to target particular practices that occurred under the English bail and committal statutes passed during the reign of Queen Mary, namely, the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.*, at 835 (internal quotation marks omitted). Reading the Confrontation Clause in light of this history, we have interpreted the accused's right to confront "the witnesses against him," U. S. Const., Amdt. 6, as the right to confront those who "bear testimony" against him, *Crawford*, 541 U. S*.,* at 51 (relying on the ordinary meaning of "witness"). And because "[t]estimony . . . is . . . a solemn declaration or affirmation made for the purpose of establishing or proving some fact," *ibid.* (internal quotation marks and brackets omitted), an analysis of statements under the Clause must turn in part on their solemnity, *Davis*, *supra,* at 836 (opinion of THOMAS, J.).

I have identified several categories of extrajudicial statements that bear sufficient indicia of solemnity to fall within the original meaning of testimony. Statements "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions" easily qualify. *White* v. *Illinois*, 502 U. S. 346, 365 (1992) (THOMAS, J., concurring in part and concurring in judgment). And statements not contained in such materials may still qualify if they were obtained in "a formalized dialogue"; after the issuance of the warnings required by *Miranda* v. *Arizona*, 384 U. S. 436 (1966); while in police custody; or in an attempt to evade confrontation. *Davis*,

*supra,* at 840 (opinion of THOMAS, J.); see also *Bryant*, 562 U. S., at 379 (same) (summarizing and applying test). That several of these factors seem inherently inapplicable to statements made to private persons does not mean that the test is unsuitable for analyzing such statements. All it means is that statements made to private persons rarely resemble the historical abuses that the common-law right to confrontation developed to address, and it is those practices that the test is designed to identify.

Here, L. P.'s statements do not bear sufficient indicia of solemnity to qualify as testimonial. They were neither contained in formalized testimonial materials nor obtained as the result of a formalized dialogue initiated by police. Instead, they were elicited during questioning by L. P.'s teachers at his preschool. Nor is there any indication that L. P.'s statements were offered at trial to evade confrontation. To the contrary, the record suggests that the prosecution would have produced L. P. to testify had he been deemed competent to do so. His statements bear no "resemblance to the historical practices that the Confrontation Clause aimed to eliminate." *Ibid.* The admission of L. P.'s extrajudicial statements thus does not implicate the Confrontation Clause.

I respectfully concur in the judgment.