Filed 12/5/24  P. v. Ventura CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>FRANCISCO VENTURA VENTURA,<br><br>        Defendant and Appellant. | F085596<br><br>(Super. Ct. No. MCR066890)<br><br><br>**OPINION** |


APPEAL from a judgment of the Superior Court of Madera County.  Brian Austin, Judge.

William W. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Francisco Ventura Ventura (defendant) molested a six-year-old girl.  He was caught in the act by the victim's adult sister, who promptly contacted the police.  The victim was medically examined and questioned by a trained forensic interviewer.

Defendant was arrested and made incriminating statements during custodial interrogation. A jury convicted defendant of lewd touching and attempted sexual intercourse with a child.

The victim refused to testify at trial, and this appeal is based on the erroneous admission of her forensic interview statements. The People concede that defendant's constitutional right of confrontation was violated. The People also contend the error was harmless. We agree.

In terms of probative value, the forensic interview evidence was relatively weak in comparison to defendant's own statements. Defendant admitted to having genital-to-genital contact with the victim, offering the bizarre explanation that he was trying to educate her about inappropriate sexual touching. Any theoretical possibility of a juror believing his story was negated by defendant's further admission that seeing and touching the six-year-old's genitalia caused him to become physically aroused. DNA evidence confirmed his admitted touching of the child's vaginal area.

Moreover, it appears the jury doubted the reliability of the victim's interview statements. Despite the child's allegation that defendant "put his privates in my privates," the jury acquitted him of the more serious crime of actual penetration. Defendant undoubtedly obtained the best outcome he could have achieved even if the error had not occurred. The judgment will be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Procedural History*

Defendant was charged with one count of sexual intercourse with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a); count 1) and one count of committing a lewd or lascivious act upon a child under the age of 14 (*id*., § 288, subd. (a); count 2). Aggravating circumstances were alleged for purposes of sentencing. Counts 1 and 2 were tried to a jury.

The victim was eight years old at the time of trial. She was subpoenaed to testify but refused to take the witness stand. The trial court eventually declared her unavailable as a witness. (See Evid. Code, § 240.) Based on the finding of unavailability, and in further reliance on Evidence Code section 1360, the trial court allowed the prosecutor to introduce evidence of the victim's prior interview statements, including a video recording of the interview.

The interview evidence was admitted over defendant's objections and was the basis for a subsequent motion for mistrial. The trial court expressed regret about having admitted the evidence, but it did not declare a mistrial. Defendant is not challenging the denial of his mistrial motion.

Both sides agreed to having the jury instructed on attempted sexual intercourse as a "lesser included" offense with respect to count 1. Defendant's trial counsel even volunteered to draft the instruction. The trial court gave the requested instruction, and in doing so repeated the parties' characterization of attempted sexual intercourse with a child as a "lesser included crime of Count One." An attempted violation of Penal Code section 288.7, subdivision (a) has been held to constitute a lesser *related* offense of the target crime (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 83–84), but the jury instructions are not at issue in this appeal.[1]

As to count 1, the jury found defendant not guilty of the charged offense. He was instead convicted of attempting to have sexual intercourse with the victim. (Pen. Code,

---

[1]There is no prohibition against an agreement that the defendant may be convicted of a lesser offense not necessarily included in the original charge. (*People v. Birks* (1998) 19 Cal.4th 108, 136, fn. 19.) Instruction on a lesser related offense is permissible "'upon the mutual assent of the parties'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1230), which clearly occurred in this case. "A jury instructed only on the charged offense might choose to acquit or convict a defendant of a greater offense than that demonstrated by the evidence if not presented with the alternative of an agreed upon lesser related offense. Indeed, that is precisely the reason parties agree to instruction on lesser related offenses—they hope to avoid giving the jury an all-or-nothing choice." (*People v. Solis* (2015) 232 Cal.App.4th 1108, 1119.)

§§ 664, 288.7, subd. (a).)  Defendant was also convicted of violating Penal Code section 288 as alleged in count 2.

Defendant successfully moved for bifurcation of the aggravating circumstances allegations.  He waived the right to have those allegations determined by the jury.  The trial court found only one of the allegations to be true, i.e., that the victim was "particularly vulnerable."  (Cal. Rules of Court, rule 4.421(a)(3).)

Defendant's acquittal on the sexual intercourse charge saved him from the punishment of a life sentence.  (Pen. Code, § 288.7, subd. (a).)  The trial court imposed the middle term of seven years for the lesser related offense.  (See Pen. Code, § 664, subd. (a).)  A middle term was also imposed for count 2 but stayed pursuant to Penal Code section 654.

### Properly Admitted Trial Evidence

#### General Background

The crimes occurred when defendant was 45 years old.  He was in a relationship with the victim's mother, and they lived together in a three-bedroom house.  Several other people resided in the home:  the six-year-old victim; the victim's adolescent brothers (both approximately 12 years old); the victim's 19-year-old sister; and the sister's own young children (an infant and a toddler).  The victim slept in the same room as defendant and her mother, but in a separate bed.[2]

#### Sister's Testimony

On the day in question, defendant had agreed to watch all five children while the victim's sister ran a quick errand.  The children were "in the living room" at the time of

---

[2]Except for defendant's age, which was provided by a police witness, the information in this paragraph comes from testimony by the victim's mother and sister.  The sister was inexplicably unable to identify defendant in court, but she did identify him from a photograph taken on the day of the incident.  The victim's mother was not home when the incident occurred, but her testimony served to confirm defendant's identity, the fact of their prior relationship and cohabitation, and the victim's date of birth.

the sister's departure. Defendant was "in the kitchen area." The sister "forgot something at home" and returned "not more than five minutes" after she had left.

Upon reentering the house, the sister noticed the victim was no longer in the living room with the other children. The sister proceeded to her own bedroom, realized she had locked herself out of the room, and then exited the house to gain entry through a rear door. While walking across the backyard, she stopped at defendant's bedroom window.

Defendant's bedroom window was partially opened. There was no screen, but the open space was covered by an interior curtain. The sister called out, asking where the victim was, and defendant responded that she was in the bathroom. The sister pulled the curtain aside and immediately discovered that defendant had lied. The victim was not in the bathroom; she was on the bedroom floor and defendant was "crouched over her."

The sister's view of defendant and the victim was obscured by a bedframe and mattress, but she was nonetheless alarmed. The sister cried out, "What are you doing?" Defendant said he was "checking for bruises." It is unclear from the record whether defendant made this statement before or after the sister "ran back to the front of the house" and "forcibly" entered the room.[3]

Once inside the bedroom, the sister "started yelling at [defendant]" and demanded an explanation. Defendant seemed "very anxious" and "very nervous," but he stuck to his excuse about "checking for bruises." The sister knew the victim "didn't have any" bruises and thus remained suspicious.

---

[3]To better explain what the sister saw from outside the window, the prosecutor introduced photographs taken from that vantage point and had the sister mark the locations of defendant and the victim. Regarding her initial observations, she testified, "I only seen, like, her head on the floor from my mom's bed, and I only seen her head but I seen him, like, crouched over her. I didn't see anything else, but it looked like he was pulling up his shorts or his boxers." On cross-examination, the sister clarified that she "didn't actually see him pulling up [his] shorts." Regarding her "forcible" entry to defendant's room, the sister testified the door "seemed locked" but admitted to not knowing whether it was in fact locked.

5.

The sister "grabbed" the victim and took her outside to the front yard.  The victim started to cry, and the sister "asked her what happened, if [defendant] did anything to her."  The victim responded by pointing between her legs and stating "that he touched her with his privates."  The sister further testified as follows:  "I had asked her if this has ever happened [before], and she said yes, when [our] mother was not home."

After hearing the victim's allegations, the sister "immediately called the police."

### Police Testimony and Defendant's Statements

A detective from the Madera Police Department testified regarding his custodial interrogation of defendant on the date of the incident and again the next day.  The initial questioning, which was not recorded, was done with the assistance of a Spanish-speaking employee of the police department.  Defendant reportedly "denied all of the allegations," admitting only to rubbing the victim's leg because she had complained of it hurting.  When asked "about whether or not his DNA would be located on [the victim's] genitals," defendant reportedly said it was possible because he "helped [the victim] clean herself" after she had gone to the bathroom.

Defendant's second interrogation was conducted with an additional detective who functioned as a Spanish-language translator.  The Spanish-speaking detective also testified at trial.  A video recording of the second interrogation was admitted into evidence and played for the jury.

Defendant's version of events, as told in his recorded interview, began chronologically with the victim being inside of a bathroom.  The victim called out to him, requesting unspecified assistance, and defendant went into the bathroom to help "clean her."  After providing the assistance, defendant exited the bathroom.  The victim remained in the bathroom for a brief period, coming out "less than a minute" later.

Defendant talked about having lowered his shorts to scratch some bug bites.  The relevance of this activity was never explained.  The scratching of the bites reportedly

6.

occurred immediately before and after he assisted the victim in the bathroom, but defendant never suggested the victim saw him doing it.

There were conflicting accounts of what happened after the victim came out of the bathroom. In defendant's initial telling of the story, the victim came out of the bathroom complaining of pain and he took her over to his bed. Defendant then "pulled down her shorts" and began rubbing her upper thigh and groin area.

When defendant recounted the events a second time, he claimed the victim had gone "back to the living room" after using the bathroom. She then returned to the bedroom complaining of pain. Defendant did not specify exactly where the victim was "'hurting,'" but his statements and demonstrative gestures implied it was in the groin area. Defendant claimed to have told the victim, "I'll massage you there, but it doesn't seem right because someone might think something bad." When the victim continued to ask for his "help," defendant pulled down her shorts and underwear and began massaging her. Defendant's gestures on the video indicated he was touching the victim's upper thigh and groin, but not her genitalia.

During the massage, the victim noticed defendant's erect penis bulging or moving underneath his clothing and asked, "'What is that?'" Defendant responded by exposing his penis and tapping or pressing it against the victim's bare genitalia. While doing this, defendant told the victim, "'If anyone does—wants to do this thing to you, put it inside this hole, you scream or you tell someone because that is not right. That's bad.'"

The video showed defendant making several demonstrative gestures to explain how he had touched the victim with his penis. He denied there was any penetration, saying, "I didn't put it inside." Defendant admitted he made a "mistake" and denied there were any prior similar incidents.

Defendant was repeatedly asked about why, and at what point, his penis became erect while interacting with the victim. The cause, he explained, was seeing and touching the victim's genitalia while assisting her in the bathroom. The interrogator suggested the

7.

real reason was because defendant had been viewing pornography. The questioning clearly implied that the victim had reported "he was watching something on [his] phone."

In response to a question about pornography, defendant said, "I always watch it when I'm working at the ranch, I never watch it in the house." Defendant later admitted to using his phone during the incident but claimed to have been looking at "Facebook." He gave the detectives permission to "check the phone," but the record does not indicate whether a search was ever performed.

### Expert Testimony

A forensic nurse examiner testified to conducting examinations of the victim and defendant on the day of the incident. The exam results were normal, without any signs of injury to the child. Swab samples were obtained from their genitalia and surrounding areas for DNA testing.

A criminalist from the California Department of Justice testified to the results of the DNA testing. Multiple samples from the victim's body tested positive for defendant's DNA. The samples taken from defendant's body did not show the presence of the victim's DNA.

### Erroneously Admitted Trial Evidence

The jury was shown a video of the victim being questioned on the day of the incident by a professional child forensic interviewer. The interview lasted approximately 51 minutes. It was conducted at the direction of, and in cooperation with, the Madera Police Department and the Madera County District Attorney's Office.

The first 10 minutes of the interview addressed background information. The focus shifted when the interviewer said, "I heard that someone did something that wasn't right." The victim stated that defendant had "put his privates in my privates."

The victim claimed defendant was "watching a video about it" and had "locked the door" to the room before the touching occurred. The "video" was playing on defendant's phone, and the victim said it involved a "boy [putting] … his privates inside

8.

… the girl's privates." When the interviewer probed for more details, the victim's responses were as follows:

> "Q: Okay. And so when he was watching the video—where the boy was putting the private parts in the girl, um, where were you?
>
> "A: I was outside at a suana [*sic*] wi—with my aunt.
>
> "Q: Wait—okay, how did you know he was watching the video if you're in the sauna with your aunt?
>
> "A: 'Cause I heard it.
>
> "Q: You heard it. What did you hear?
>
> "A: Uh, mm, I don't know what I heard."

The interviewer gave up on the video questioning and moved on to asking about the locked door. The victim provided the following narrative: "He locked the door and then he—then my sister opened the window and—and [s]he said if I'm in there. And he said, yes. He, or, she opened the curtains—he saw me on the floor and he saw, um, [defendant] … with his boxers on. [¶] … [¶] … My sister, uh, opened the door and yelled—and started yelling at him." Defendant allegedly told the sister he was checking to see if the victim had "'a bladder infection.'"

The interviewer attempted to elicit more details, but with little success. The victim repeated the same basic story: "When he was watching the [video] … I went inside the room. He locked the door. He—he took off his shorts. And—and then my sister opened the window, she seen that I was in there. I was on the floor. And sh—she started yelling at [him]."

The victim was asked, "Has this ever happened any other time?" She responded affirmatively and referenced the "start of the coronavirus" (which would have been only a few months earlier), but then went back to describing the current incident. When the interviewer sought clarification about prior incidents, the victim essentially retracted her allegation. The interviewer revisited the issue periodically, trying at least five more times

9.

to obtain information about past abuse, but the victim continued to deny there had been any prior incidents.

**DISCUSSION**

## I.     Legal Overview

The right of confrontation, as guaranteed by the Sixth Amendment to the federal Constitution and made applicable to the states through the Fourteenth Amendment, ensures the opportunity for cross-examination of adverse witnesses.  (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.)  "Via the confrontation right, a defendant is able to compel prosecution witnesses to appear before the jury so their credibility may be assessed." (*People v. Wilson* (2021) 11 Cal.5th 259, 290.)  In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that the confrontation clause bars the admission of "testimonial hearsay" unless (1) the hearsay declarant is unavailable and (2) the defendant had a previous opportunity for cross-examination. (*Crawford*, at pp. 53, 68.)

"Hearsay is an out-of-court statement that is offered for the truth of the matter asserted, and is generally inadmissible."  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108, citing Evid. Code, § 1200.)  There are numerous exceptions to the general rule of inadmissibility.  However, some hearsay may fall within a state law exception and still be inadmissible under *Crawford*.  (*People v. Rincon* (2005) 129 Cal.App.4th 738, 754.)

"'Whether a challenged statement is hearsay is always the threshold question' in analysis of a *Crawford* claim."  (*People v. Nadey* (2024) 16 Cal.5th 102, 162.)  If the statement is hearsay but subject to an exception, courts must additionally determine whether the hearsay is "testimonial."  (See *Davis v. Washington* (2006) 547 U.S. 813, 823–829; *People v. Cage* (2007) 40 Cal.4th 965, 981.)  "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony."  (*People v. Sanchez* (2016) 63 Cal.4th 665, 689.)

10.

"On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation." (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.) "We evaluate the primary purpose for which the statement was given and taken under an objective standard, 'considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.'" (*Ibid.*, quoting *People v. Cage*, *supra*, 40 Cal.4th at p. 984.) The erroneous admission of testimonial hearsay is evaluated for prejudice under the standard of *Chapman v. California* (1967) 386 U.S. 18. (*People v. Valencia* (2021) 11 Cal.5th 818, 840.)

## II.     The Sister's Hearsay Testimony Was Admissible

Defendant disputes the admissibility of certain testimony by the victim's sister. The statements in question are (1) the victim's allegation that defendant "touched her with his privates" and (2) the victim's affirmative response when the sister asked if anything similar had happened in the past. Defendant contends this hearsay was testimonial. We disagree.

### A.     Admissibility Under State Law

Although defendant does not address the question of admissibility under state law, we note the trial court relied on the statutory exception for excited utterances. (Evid. Code, § 1240.) "'To be admissible, "(1) there must be some occurrence startling enough to produce … nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it."'" (*People v. Lynch* (2010) 50 Cal.4th 693, 751–752.)

"The decision to admit evidence under Evidence Code section 1240 is reviewed for abuse of discretion." (*People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1588.) Such rulings necessarily involve factual determinations, which are upheld on appeal if

11.

supported by substantial evidence.  (*Id.* at p. 1589; see *People v. Poggi* (1988) 45 Cal.3d 306, 318.)  Defendant makes no attempt to demonstrate insufficient evidence or an abuse of discretion with regard to the excited utterance ruling.  Perceiving no such errors ourselves, we turn to the issue of whether the hearsay was testimonial.

### B.      Admissibility Under *Crawford*

The *Crawford* rule applies only to "testimonial" hearsay.  (*People v. Cage*, *supra*, 40 Cal.4th at p. 981.)  "[A] statement is testimonial when two critical components are present."  (*People v. Lopez* (2012) 55 Cal.4th 569, 581.)  "First, … the out-of-court statement must have been made with some degree of formality or solemnity."  (*Ibid.*)  Second, it must have been "'given with the "primary purpose of creating an out-of-court substitute for trial testimony"' or 'made with the primary purpose of creating evidence for [the defendant's] prosecution.'"  (*People v. Morales* (2020) 44 Cal.App.5th 353, 361, quoting *Ohio v. Clark* (2015) 576 U.S. 237, 245, 246.)

Under earlier California Supreme Court precedent, testimonial hearsay required the involvement of someone—typically the questioner/listener— who was "in an agency relationship with law enforcement."  (*People v. Geier* (2007) 41 Cal.4th 555, 605; see, e.g., *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1203 [concluding appellant's statements to a witness were not "testimonial within the meaning of *Crawford* because it was not a conversation involving an agent of the police"].)  Those cases predated *Ohio v. Clark*, *supra*, 576 U.S. 237, which addressed "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause."  (*Id.* at p. 246.)  The United States Supreme Court "'decline[d] to adopt a categorical rule excluding them from the Sixth Amendment's reach' but noted 'such statements are much less likely to be testimonial than statements to law enforcement officers.'"  (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 694, fn. 19, quoting *Clark* at p. 246.)  "Accordingly, whether a statement

was made by or to a government investigating agent remains an important, but not dispositive, part of the analysis." (*Sanchez*, at p. 694, fn. 19.)

"In conducting a primary purpose analysis, courts consider both whom the statement was made *by* as well as whom it was made *to*." (*People v. Morales*, *supra*, 44 Cal.App.5th at p. 361; see *People v. Lamb* (2024) 16 Cal.5th 400, 431 [noting the statements in dispute "were not made by their declarants for the primary purpose of preserving evidence for later use at trial"]; *People v. Sanchez*, *supra*, 63 Cal.4th at p. 688 ["the test is objective and takes into account the perspective of both questioner and interviewee"].) Because the declarant's intent is a key factor, statements by young children to persons not in an agency relationship with police "will rarely, if ever, implicate the Confrontation Clause." (*Ohio v. Clark*, *supra*, 576 U.S. at p. 248; see *ibid*. ["Few preschool students understand the details of our criminal justice system"].) For similar reasons, "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." (*Id*. at p. 249.)

"A court also considers the formality '"of the situation and the interrogation"' in determining the primary purpose of a challenged statement. [Citation.] 'In the end, the question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony."' [Citation]." (*People v. Rangel*, *supra*, 62 Cal.4th at pp. 1214–1215.)

None of the factors support defendant's claim regarding the victim's statements to her sister. The sister's purpose in questioning the victim may have been to determine whether a police investigation was warranted, but nothing suggests any thought was given to the victim's responses being used in lieu of trial testimony. The circumstances are analogous to those in *Ohio v. Clark*, *supra*, 576 U.S. 237, where the declarant's preschool teachers had inquired about signs of physical abuse. (*Id*. at p. 241.) It was

13.

"irrelevant that the teachers' questions and their duty to report the matter had the natural tendency to result in [the appellant's] prosecution." (*Id*. at p. 250.)

## III. Admission of the Forensic Interview Evidence Was a Harmless Error

The trial court admitted the forensic interview evidence pursuant to Evidence Code section 1360. This statute creates a hearsay exception for statements made by a child "describing any act of child abuse or neglect performed with or on the child by another …." (*Id*., subd. (a).) The statute purports to be applicable when the declarant is "unavailable as a witness" if there are "sufficient indicia of reliability" and "evidence of the child abuse or neglect that corroborates the statement made by the child." (*Id*., subd. (a)(2), (3)(B).) However, Evidence Code section 1360 was enacted prior to *Crawford* and has never been updated to reflect contemporary Confrontation Clause jurisprudence. (See Stats. 1995, ch. 87, § 3.)

In *People v. Sisavath* (2004) 118 Cal.App.4th 1396, this district found *Crawford* error in the use of forensic interview statements admitted under Evidence Code section 1360 because the appellant never had an opportunity to cross-examine the child declarant. (*Sisavath*, at pp. 1400–1402.) The fact that the interviewer was "'not a government employee'" did not change the testimonial nature of the hearsay. (*Id*. at p. 1402.) Like the circumstances of this case, the interview in *Sisavath* was conducted in cooperation with the police and the district attorney's office. (*Id*. at pp. 1402–1403.)

Here, the forensic interviewer admitted to having acted "at the behest of law enforcement." The interviewer further acknowledged, "[I]t's not a regular conversation [with the child]. It's a structured conversation. … [I]t's basically gathering evidence of a crime." The People appropriately concede the forensic interview evidence was testimonial and, because defendant had no opportunity to cross-examine the victim, the evidence was inadmissible under *Crawford*.

"""'"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman*[.]' … We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error."'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 395.) *Crawford* errors may be found harmless when the testimonial hearsay was cumulative of other properly admitted evidence and/or the admissible evidence of the defendant's guilt was overwhelming. (See *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661; *People v. Cage*, *supra*, 40 Cal.4th at p. 993; see also *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.)

The forensic interviewer provided foundational testimony for the video recording of the interview. In doing so, she accurately summarized what the video depicted. The interviewer noted the victim "was very avoidant." "She did [tell the interviewer] what happened, but she did not give details of—very much details of the incident."

The trial court, while considering defendant's motion for mistrial, made the following statements about the forensic interview evidence. "You know, that video, I wish we hadn't shown it because I don't think it really helped on the case. I think the case was made by the statements of the defendant …." We agree with this assessment.

The jury deliberated for several hours and asked to review (1) the forensic interview video, (2) the custodial interrogation videos, and (3) the sister's trial testimony. Lengthy deliberations and requests to review evidence often indicate that a case was "close" and evidentiary errors were prejudicial. (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295; see *People v. Cardenas* (1982) 31 Cal.3d 897, 907.) In this case, however, the jury's scrutiny of the evidence resulted in defendant being found not guilty of having sexual intercourse with the victim.

As used in Penal Code section 288.7, the act of sexual intercourse "means any penetration, no matter how slight, of the vagina or genitalia by the penis." (*People v. Mendoza*, *supra*, 240 Cal.App.4th at p. 79.) The only difference between the actus reus of the charged crime and the lesser related attempt offense is the element of penetration.

15.

Penal Code section 288.7 is a general intent crime, but an attempt to commit it requires the heightened mens rea of specific intent. (*Mendoza*, at pp. 79, 83.)

The primary evidence of penetration was the victim's allegation in the forensic interview that defendant "put his privates in my privates." The sister testified the victim alleged only that defendant "touched her with his privates," which was consistent with defendant's own admissions. Defendant denied there was penetration. Therefore, as previously noted, the jury evidently found the forensic interview evidence to be unreliable—at least with regard to the victim's most significant allegation.

The fact defendant touched the victim's genitalia was undisputed and independently confirmed by the DNA evidence. Defendant argues the jury's mens rea findings may have been influenced by the victim's statements regarding prior similar incidents and the allegation defendant "was watching a video on his phone" before or during the improper touching. Neither argument is persuasive.

The victim's initial affirmative response to the forensic interviewer's question about prior incidents was essentially cumulative of the sister's testimony on the same subject. The sister testified, "I had asked her if this has ever happened, and she said yes, when my mother was not home." The sister's testimony was not suggestive of any equivocation in the victim's response. But in the forensic interview, the victim quickly retracted her allegation and repeatedly denied there had been any prior abuse. If anything, the interview statements bolstered the defendant's claim that it was an isolated incident.

As for the alleged cell phone video, defendant's custodial statements were far more incriminating than the victim's related allegations. An admission to viewing pornography prior to the inappropriate touching would have provided a less inflammatory explanation for defendant's physical arousal. Defendant admitted to using his phone during the incident but claimed to have been looking at "Facebook." In other words, the fact defendant had viewed something on his phone was uncontroverted. Defendant also

16.

admitted to viewing sexual content on his phone at other times, but only when "working at the ranch."

The pornography allegation was properly before the jury based on the questions asked by detectives during the recorded interrogation. Defendant responded by claiming to have gotten "hard" from seeing and touching the victim's genitalia while allegedly assisting her in the bathroom. In light of those statements, no reasonable juror could have believed defendant's story about trying to educate the victim regarding inappropriate touching. The jury's verdicts reflect the overwhelming evidence of defendant's guilt, and the result would have undoubtedly been the same without the *Crawford* error.[4]

## DISPOSITION

The judgment is affirmed.

PEÑA, Acting P. J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.

---

[4]It is also possible the jury concluded the bathroom story was a complete fabrication. Reasonably intelligent jurors would likely be skeptical based on common experience, i.e., the fact that most six-year-olds do not require assistance "cleaning" themselves after using the toilet. Although not mentioned in the parties' briefs, we observe the victim answered "no" when the forensic interviewer asked if she had used the bathroom that day and if anybody ever helped her use the bathroom. The victim also said, "I clean myself 'cause I'm—I'm big." Those facts provide some support for defendant's claim but do not change our prejudice analysis, which is based on the totality of the circumstances. As stated, defendant's bathroom story was inherently dubious. Moreover, the sister testified to catching defendant in a blatant lie about the victim being in the bathroom when she was actually on the bedroom floor.

17.