*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SCOTT RICHARD JUREWICZ,

        Defendant-Appellant.

UNPUBLISHED
January 21, 2021

No. 342193
Jackson Circuit Court
LC No. 15-004930-FC

## ON REMAND

Before: O'BRIEN, P.J., and FORT HOOD and CAMERON, JJ.

PER CURIAM.

This matter returns to this Court on remand from our Supreme Court with directions that we resolve defendant's claim of ineffective assistance of counsel, which arises from defense counsel's failure to call two expert witnesses at trial. *People v Jurewicz*, 948 NW2d 448 (Mich, 2020). We have been instructed to review defendant's claim under the correct standard—the *Strickland*[1] standard—which asks (1) whether counsel's performance was objectively unreasonable, and (2) whether defendant has demonstrated that but for counsel's deficient performance, there exists a reasonable probability that the result would have been different. *Id*. As with our prior opinion, we once again affirm.

## I. FACTUAL BACKGROUND

Defendant was convicted by a jury of felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). *People v Jurewicz*, 329 Mich App 277, 379; 942 NW2d 116 (2019), vacated and remanded 948 NW2d 448 (Mich, 2020). He was sentenced to life without parole for murder and 50 to 75 years' imprisonment for the child-abuse conviction. *Id*. Our previous opinion detailed the factual predicate for defendant's convictions:

---

[1] *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

-1-

This case arises out of defendant's murder of an 18-month-old child. On March 14, 2015, defendant ate a spaghetti dinner with his son, defendant's then girlfriend, and her three children, EH, LH, and BH. After dinner, defendant put BH to bed. BH became fussy and defendant became frustrated, so defendant "shook [BH] a little bit" and "put him back down . . . hard[ ]" in his crib. BH abruptly stopped crying, and defendant went downstairs. After a few minutes, defendant returned upstairs to check on BH. According to defendant, when he returned upstairs he discovered noodles spilling out of BH's mouth, and BH was lifeless and purple. First responders were able to restart BH's heart, but he was immediately placed on life support and died three days later. A CAT scan showed that an "overall loss of oxygen for a period of time caused brain damage and the cells of the brain to die." BH had retinal hemorrhages in both eyes, and an MRI showed swelling in his spine.

After BH's death, BH's mother left defendant and defendant began dating again. Two months later, defendant was present when his new girlfriend's young son, JP, was found smothered to death in his crib. While BH's death was being investigated, Child Protective Services (CPS) was investigating EH and LH's home to ensure their safety. Following JP's death, CPS also began investigating the home of JP's brother, SC, to ensure SC's safety. During separate forensic interviews with CPS, SC and EH stated that they had been choked by defendant. Defendant was eventually charged and convicted with BH's murder on a theory that the cause of BH's death was homicide from blunt-force trauma. [*Id*. at 379-380.]

On appeal, defendant raised two challenges: "(1) his trial counsel was ineffective for failing to call expert witnesses, and (2) his constitutional right to confront the witnesses against him was violated by the admission of hearsay statements made by two approximately three-year-old children." *Id*. at 379. The ineffective-assistance claim is again before this Court.[2]

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The ineffective-assistance claim centers on whether defendant's counsel should have called two expert witnesses to testify at trial: Dr. Leslie Hamilton and Dr. Michael Pollanen. *Id*. at 380. As we previously explained regarding Dr. Hamilton:

Dr. Hamilton reviewed BH's medical records and authored a report opining that there was no evidence of trauma in BH's spine; rather, in Dr. Hamilton's opinion, the damage to BH's spine was caused by whatever unidentified event caused his brain to swell, which was not necessarily a "shaking-type trauma." Dr. Hamilton ultimately concluded that "it [was] not possible to make the neuropathologic

---

[2] As will be explained below, our Supreme Court's order vacated this Court's opinion without qualification. However, the order only specifically finds fault with our prior analysis of the ineffective-assistance claim, and does not direct us to reevaluate the Confrontation Clause/hearsay issue. With both of those issues in mind, we elect below to briefly address the confrontation issue as an affirmation of our prior analysis.

diagnoses of 'shaking' or 'whiplash,' " which largely contradicted the prosecution's theory of the case. Defendant argues that defense counsel erred when he failed to call Dr. Hamilton as a witness to present these conclusions to the jury and that this failure prejudiced him. [*Id*. at 382.]

Similarly, "Dr. Pollanen authored a report concluding that the cause and manner of BH's death could not be determined." *Id*. at 383.

But while neither Dr. Hamilton nor Dr. Pollanen were called to testify at trial, defense counsel made their opinions known to the jury. As we explained:

First, defendant's counsel presented Dr. Hamilton's report during the testimony of Dr. Carl Schmidt, and Dr. Schmidt confirmed more than once that Dr. Hamilton did not believe BH's injuries could have been "caused by shaking." Dr. Hamilton's report was then presented a second time during the testimony of Dr. Evan Matshes. Dr. Matshes confirmed that Dr. Hamilton had concluded there was no evidence of whiplash, shaking, or jerking. [*Id*.]

Similarly,

Dr. Pollanen's conclusions were also presented to the jury via the testimony of Dr. Matshes, as well as through the testimony of Dr. Jeffrey Jentzen. Dr. Matshes testified as to Dr. Pollanen's conclusion that the cause and manner of BH's death were indeterminable, even noting that he had initially agreed with that conclusion. Dr. Jentzen testified that he had reviewed Dr. Pollanen's report and explained that Dr. Pollanen "couldn't call [BH's death] a homicide." Thus, as with Dr. Hamilton, two expert witnesses testified regarding Dr. Pollanen's conclusions . . . . [*Id*. at 383-384.]

In addressing defendant's claim of ineffective assistance we explained that, as no evidentiary hearing was held below, our review was limited to "mistakes apparent on the record." *Id*. at 380-381. We explained the ineffective-assistance framework, including the *Strickland* test. *Id*. at 381-382. We ended our explanation of the ineffective-assistance framework with the following:

"The failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense. Similarly, the failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." [*People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012)] (quotation marks, citations, and brackets omitted). [*Jurewicz*, 329 Mich App at 382.]

We held that, with respect to Dr. Hamilton, "[d]efendant had not shown that Dr. Hamilton's testimony would have provided him a 'substantial defense' not otherwise available given that the conclusions contained in Dr. Hamilton's report *were*, in fact, presented to the jury." *Id*., citing *Russell*, 297 Mich App at 716. "Because two experts testified regarding the conclusions reached in Dr. Hamilton's report, we fail[ed] to see how calling Dr. Hamilton as a witness would have provided any new information for the jury to consider." *Jurewicz*, 329 Mich App at 383. We also

noted that counsel's decision not to call Dr. Hamilton may have been strategic. "Indeed, trial counsel's tactic of not calling Dr. Hamilton as a witness enabled the defense to use her expert opinion to undermine the conclusions of the prosecution's expert witnesses[] without exposing Dr. Hamilton to cross-examination." *Id*. As such, we could not "conclude that defense counsel's decision not to call Dr. Hamilton deprived defendant of a substantial defense." *Id*.

With respect to Dr. Pollanen, our analysis was essentially the same. "Again, defendant ha[d] not shown that Dr. Pollanen's testimony would have provide[d] him a substantial defense not otherwise available." *Id*. Dr. Pollanen's conclusions were brought out through the testimony of two other experts. *Id*. "Thus, as with Dr. Hamilton, . . . defendant ha[d] failed to establish that Dr. Pollanen would have offered any new information that would amount to a substantial defense not otherwise provided." *Id*. at 383-384. Ultimately, we held:

> Because it has not been shown that counsel's failure to call Dr. Hamilton and Dr. Pollanen deprived defendant of a substantial defense, we cannot conclude that defense counsel's actions fell below an objectively reasonable standard. Without needing to reach the issue of prejudice, we conclude that defendant's ineffective assistance of counsel claim is without merit. [*Id*. at 384 (footnote omitted).]

We note that, in his appeal to this Court, defendant's phrasing of the ineffective-assistance claim asked whether counsel was ineffective because, by failing to present expert witnesses, counsel "deprived [defendant] of a substantial defense . . . ." Defendant's argument included authority from this Court standing for the premise that "[t]he failure to call a witness constitutes ineffective assistance of counsel 'when it deprives the defendant of a substantial defense.' *People v Payne*, 285 Mich App 181, 190[; 774 NW2d 714] (2009)." Nowhere in his briefing did defendant contend that this principle of law was incorrect. Yet on appeal to the Supreme Court, and with new appellate counsel, defendant argued that this Court erred by imposing a requirement on defendant that he show that counsel's performance deprived him of a substantial defense. Defendant argued that no such requirement existed in any authority of the Michigan Supreme Court or of the United States Supreme Court.[3]

On September 25, 2020, the Supreme Court entered an order vacating this Court's opinion:

> On order of the Court, the application for leave to appeal the August 6, 2019 judgment of the Court of Appeals is considered and, pursuant to MCR 7.305(H)(1), in lieu of granting leave to appeal, we VACATE the judgment of the Court of Appeals and we REMAND this case to that court for reconsideration of the defendant's ineffective assistance of counsel claim under the correct standard. The

---

[3] A Westlaw search for the terms "ineffective" and "substantial defense" used in the same sentence returned nearly 1,300 cases in criminal matters, virtually all from this Court. The vast majority of those are unreported, but there were 25 reported cases. The rule may be found in published authority of this Court dating back to at least 1985. See *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985) ("Only where counsel's failure to call a witness deprives defendant of a substantial defense is he entitled to relief").

-4-

Court of Appeals erred in holding that " '[t]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense.' " *People v Jurewicz*, 329 Mich App 377, 382 (2019), quoting *People v Russell*, 297 Mich App 707, 716 (2012). The defendant was not required to show, in order to obtain relief for ineffective assistance of counsel, that trial counsel's failure to call witnesses deprived him of a substantial defense. Rather, a claim of ineffective assistance of counsel premised on the failure to call witnesses is analyzed under the same standard as all other claims of ineffective assistance of counsel, i.e., a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51 (2012); see also *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d [674] (1984). On remand, the Court of Appeals should resolve the defendant's claim of ineffective assistance of counsel under this standard. [*Jurewicz*, ___ Mich at ___; 948 NW2d at 448 (alteration in original).][4]

Applying the standard we have been instructed to utilize, we conclude that defendant has failed to establish either prong of the *Strickland* test.

Both the United States and Michigan Constitutions provide criminal defendants with the right to the assistance of counsel. Const 1963, art 1, § 20; US Const, Am VI.

In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. [*Trakhtenberg*, 493 Mich at 51 (citation omitted).]

"In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id*. at 52. "[T]he failure to call a particular witness at trial is presumed to be a matter of trial strategy, and an appellate court does not substitute its judgment for that of counsel in matters of trial strategy." *People v Seals*, 285 Mich App 1, 21; 776 NW2d 314 (2009). But courts " 'cannot insulate the review of counsel's performance by calling it trial strategy;' counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015), quoting *Trakhtenberg*, 493 Mich at 52. "Courts must determine whether the 'strategic choices were made after less than complete investigation,' or if a 'reasonable decision made particular investigations unnecessary.' " *Ackley*, 497 Mich at 389, quoting *Strickland*, 466 US at 690-691 (brackets omitted). It is important to remember that "[a] trial strategy is not ineffective simply because it ultimately does not succeed." *People v White*, 331 Mich App 144, ___; 951 NW2d 106, 109 (2020). "A strategy is also not

---

[4] It would appear that the entire line of authority discussed in the prior footnote has thus been overruled.

ineffective because it entails taking calculated risks, especially if the range of available options for the defense is meager." *Id*. at ___; 951 NW2d at 109-110. Regarding the prejudice prong, i.e., the requirement that defendant must show a reasonable probability that counsel's performance affected the outcome of the trial, " '[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Ackley*, 497 Mich at 389, quoting *Strickland*, 466 US at 694.

Regarding whether counsel's performance was objectively reasonable, defendant fails to establish that the decision not to call either expert to testify was anything but sound trial strategy. It is abundantly clear that counsel was aware of the opinions of both Dr. Hamilton and Dr. Pollanen. Counsel used the reports of both experts to attempt to persuade the jury that the prosecutor's experts were incorrect to conclude that BH's death was a homicide. Thus, this is not a situation comparable to *Ackley*, 497 Mich 381, as defendant now tries to argue in his supplemental briefing to this Court.

In *Ackley*, a three-year-old child died in the defendant's care. *Id*. at 384. The defendant claimed he discovered the child lying unresponsive on the floor next to her bed, apparently the result of an accidental fall while she was asleep, while the prosecutor alleged that defendant had killed the child, either by blunt-force trauma or by shaking. *Id*. "Given the lack of eyewitness testimony and any other form of direct evidence, expert testimony was the cornerstone of the prosecution's case." *Id*. The prosecution called five expert witnesses to testify, all of whom agreed that the child's death was the result of an abusive head injury. *Id*. Defendant called no experts at all, "although the court had provided funding for expert assistance." *Id*.

After defendant was convicted, an evidentiary hearing was held to inquire into defense counsel's effectiveness. *Id*. at 384-385. Counsel explained at the hearing that he contacted a single expert, who advised counsel that he would not be a good expert for the defendant's case. *Id*. at 385. This was because the expert, Dr. Brian Hunter, tended to agree, as would many experts, that the injuries suffered by the decedent were the product of abusive head trauma. *Id*. But Dr. Hunter explained that there was a deep divide in the medical community, " 'like a religion,' " and that other experts who did not share Dr. Hunter's view of the medical debate regarding SBS/AHT diagnoses would be more suited to help defendant's case. *Id*. Dr. Hunter recommended such an expert to defense counsel, who he believed would be the best person to assess the case and give defense counsel his " 'best shot.' " *Id*. at 385-386. But counsel never contacted that expert, nor any other expert in injuries caused by short falls. *Id*. at 386. Counsel did not read any of the medical literature on the subject himself. *Id*. Rather, defense counsel continued to pursue Dr. Hunter's assistance, despite Dr. Hunter warning defense counsel that " 'you don't want me as your defense expert.' " *Id*.

Ultimately, Dr. Hunter's advice "was [counsel's] only method of preparing to cross-examine the prosecution's experts on the viability of their SBS/AHT theory of the child's cause of death." *Id*. at 387 (footnote omitted). Our Supreme Court determined that council's decision to rely solely on Dr. Hunter's assistance was not objectively reasonable. *Id*. at 389-394. "Given the centrality of expert testimony to the prosecution's proofs and the highly contested nature of the underlying medical issue, counsel committed . . . error by failing to consult an expert who could meaningfully assist him in advancing his theory of defense and in countering the prosecution's theory of guilt." *Id*. at 394.

Defendant now suggests that *Ackley* stands for the premise that in any SBS/AHT case where there is a dispute regarding the cause of death, counsel has an absolute duty to call, as witnesses at trial, experts on the side of the medical debate beneficial to the defendant. *Ackley* stands for no such thing. It simply stands for the premise that in that case, "counsel's efforts to investigate and attempt to secure suitable expert assistance in preparing and presenting defendant's case fell below an objective standard of reasonableness." *Id*. at 393. *Ackley* does not purport to dictate how an attorney must go about presenting a case to a jury.

Indeed, if defendant was correct to read *Ackley* as requiring counsel to call experts to testify, counsel would be deprived of the ability to use his or her best judgment in deciding whether to call an expert to testify. There may be cases in which counsel seeks the assistance of one or more experts, but reasonably concludes that calling an expert is not the best strategy. For example, counsel may believe that it is best to try not to focus on medical evidence in a particular case. Thus, presenting experts would not be preferable, as that would tend to turn the case into a "battle of the experts" that counsel may not believe would best serve his or her client. See *People v LeBlanc*, 465 Mich 575, 581-582; 640 NW2d 246 (2002).[5] There may be cases in which it is better to rely on expert reports rather than call the expert to testify, and run the risk that the expert's testimony may not ultimately be consistent with his or her report. It may also be that counsel reasonably concludes that it is not worth risking putting the expert on the stand because the expert's credibility could be eviscerated on cross-examination. While *Ackley* does not condone entirely ignoring potentially valuable expert assistance, *Ackley* also does not call for hamstringing counsel's ability to make strategic choices with regard to actually calling an expert witness to testify.

The present case is not the same. The question in this case ultimately boils down to whether defendant has shown that counsel's choice not to call Dr. Hamilton or Dr. Pollanen to testify at trial, and to instead introduce the opinions of those experts by discussing their reports while questioning other witnesses, was unsound strategy. We believe that the answer is clear: defendant has not. "Effective assistance of counsel is presumed, and defendant bears a heavy burden of proving otherwise." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). And again, whether to call a witness to testify is presumed to be a matter of trial strategy, which this Court does not second-guess on appeal. *Seals*, 285 Mich App at 21. Here, there are multiple, conceivable reasons why counsel may not have wanted either expert to be called as a witness.

As defendant emphasizes in his brief, one of the experts that had been favorable to defendant changed his mind and instead testified that BH's death could be diagnosed as a

---

[5] In *LeBlanc*, defense counsel decided that, rather than present an expert witness in a sexual assault case, which would lead the jury view the case as a battle between experts, it would be better to try to persuade the jury that the prosecution's expert was not credible or objective. *Id*. at 581. The trial court found that counsel's strategy was a reasonable and legitimate tactical decision. *Id*. at 582. The Supreme Court concluded that "the decisions made by defense counsel concerning use of an expert witness were well within the bounds of sound professional representation, and did not come close to depriving the defendant of a fair trial." *Id*. at 583 (footnote omitted).

homicide. Counsel may have been concerned that his other experts could also change their opinions on the stand for the same reasons Dr. Matshes changed his own. [6] The reports, on the other hand, were static; there was no risk that the reports could somehow reverse course and support the prosecution's theory of the case. Counsel may well have felt that the best strategy was to proceed with only those reports, which represented the only scientific evidence counsel absolutely knew would be to his client's benefit, instead of risking further defections. In fact, defendant has not ruled out the possibility that counsel already *knew* that Drs. Hamilton and Pollanen would reverse course if called to testify.

Second, and as we acknowledged in our prior opinion, counsel may have not wanted to call either doctor so that neither would be subject to cross-examination. Counsel may well have feared that, had either expert testified, they would have performed poorly on cross-examination, dooming defendant's case. The reports, on the other hand, could not answer questions posed to them, and could not appear unprepared. And perhaps counsel knew that, if made available for cross-examination, the prosecutor could bring out other information from these experts that would lower their credibility in the jury's eyes. And certainly, one would expect that, given Dr. Matshes's change of position, Drs. Hamilton and Pollanen would be asked on cross-examination if their opinions had changed in light of the fact that defendant was now suspected of having killed another child a few months after BH died. This would raise the possibility of these doctors changing their opinions, while also reinforcing to the jury that defendant was a suspect in the murder of another child. It is quite understandable that counsel would not want to take those risks.

And, of course, there is at least a third possibility. Counsel may have ultimately felt that the best chance of an acquittal would not be to engage in a battle of the experts, but rather, to attempt to challenge the credibility of the prosecution's experts on cross-examination. Counsel may have felt that by presenting the reports and engaging in cross-examination, he could show that the prosecution's experts' opinions were clouded by their own preconceived biases in such matters, and that ultimately, their conclusions were not credible or objective. That would be the same strategy deemed eminently reasonable in *LeBlanc*, 465 Mich at 581-582. All in all, there are multiple reasons why counsel could have reasonably concluded that the best course of action was not to call either doctor to testify, but instead, to put their existing opinions to the jury in a different way.

---

[6] To put the issue into perspective, Dr. Matshes was retained by defense counsel. He initially opined that, based on his review of the evidence, BH's cause and manner of death could not be determined. He did not believe that there was evidence of "blunt head trauma" or "blunt neck trauma," and that instead, there was "only evidence of oxygen deprivation-related brain injury." However, after learning that defendant had been present when another child died a few months after BH's death, Dr. Matshes authored an updated report indicating that it was more than likely that BH died at the hands of another person, but that it would also be reasonable to conclude that BH's cause and manner of death were undetermined. In other words, Dr. Matshes's change of heart was not based on any new medical information, but rather, on the revelation that defendant was suspected of killing another child.

Of course, there is no record explaining to this Court exactly why defendant's trial counsel did not call either witness. Defendant suggests in his briefing that counsel did not call Dr. Hamilton or Dr. Pollanen because neither was listed on defendant's witness list, and counsel did not do enough of an investigation before coming to trial to realize that mistake. But that is just a theory. It is equally possible, if not more so, that counsel chose not to ask for leave to amend the witness list because, as a matter of strategy, he did not believe it was best to have either witness testify. It is defendant, of course, who bears the burden of proving the factual predicate of his claim of ineffective assistance. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Yet, defendant argues in his supplemental briefing that this Court should *not* remand for an evidentiary hearing, and that the present record is all that is needed. To the extent defendant even acknowledges the possibility of a remand, defendant says it should be only to evaluate whether he has established prejudice. For whatever reason, defendant apparently does not want his former trial counsel to be given the opportunity to explain his decisions.

Our review of the question is—and pursuant to defendant's wishes, will remain—limited to the existing record. *Payne*, 285 Mich App at 188. That record does not show that counsel's decisions regarding whether to call Dr. Hamilton or Dr. Pollanen were anything but sound strategic decisions. In the end, defendant's argument is nothing more than a request that this Court second-guess counsel's strategy regarding how best to present Dr. Hamilton's and Dr. Pollanen's opinions to the jury. Again, it is not this Court's place to second-guess counsel's strategic decisions, *Seals*, 285 Mich App at 21, nor is counsel ineffective simply because his strategy ultimately did not succeed, *White*, 331 Mich App at ___; 951 NW2d at 109.

Lastly, even were we to conclude that defense counsel's performance fell below a reasonably objective standard, we would not conclude on the basis of the record before us that said deficiency prejudiced the outcome of the proceedings. For the reasons articulated above, it is not clear that either Drs. Hamilton or Pollanen would have testified consistently with their reports, and this is particularly true where, as here, Dr. Matshes changed his mind, and not based on any changes to his understanding of the scientific evidence, but instead, because he became aware that defendant was suspected of killing another child. It is entirely possible that Dr. Hamilton or Dr. Pollanen would have had the same change of heart.

And, even more importantly, as we noted in our prior opinion, "the evidence against defendant was overwhelming . . . ." *Jurewicz*, 329 Mich App at 395. Defendant was the only individual present when BH died. *Id*. Six experts testified, and "written reports from seven medical experts" largely agreed that BH's death was a homicide caused by blunt-force trauma. *Id*. There was substantial evidence showing "that defendant had a history of engaging in abusive conduct with his girlfriends and their children." *Id*. at 395-396. There was testimony that other children left in defendant's care showed signs of being choked. *Id*. at 396. There was even an admission by defendant made during a police interview whereby defendant admitted "to picking up BH, shaking him, and putting BH 'back down on the bed harder than [he] should' have." *Id*. Once again, "[t]here was no shortage of evidence against defendant in this case." *Id*.

In light of all of the above, in addition to our conclusion that defendant has failed to establish that his counsel's performance was deficient, we cannot conceive of how live testimony by Drs. Hamilton and Pollanen would have led to a different result in this case, particularly given

the fact that those opinions—as well as defendant's admission—were made known to the jury, which chose to convict defendant anyway.

## III. THE CONFRONTATION CLAUSE

Our prior opinion in this case addressed two general claims: the above claims regarding counsel's effectiveness, and claims regarding the admission of hearsay statements at trial. As noted above, the Supreme Court's remand order appears to vacate our opinion without qualification. Yet, the order only directs this Court to reconsider defendant's ineffective-assistance claims, and we note that neither party has taken issue with our previous analysis of the hearsay issues either before our Supreme Court or now on remand. With that in mind, we see no reason to disturb our prior conclusions concerning the hearsay statements of SC and EH that were admitted at trial.

As we noted in our prior opinion:

A defendant has the right to be confronted with the witnesses against him during criminal prosecutions. US Const, Am VI; Const 1963, Art 1, § 20; *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Whether a defendant was denied his Sixth Amendment right to confrontation is a question of constitutional law that this Court reviews de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The Confrontation Clause generally prohibits the admission of out-of-court testimonial statements unless the declarant was unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 US at 68. [*Jurewicz*, 329 Mich App at 384-385.]

"The central question for determining whether a statement is testimonial with respect to the Confrontation Clause is whether, "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to create an out-of-court substitute for trial testimony.' " *Id.* at 386, quoting *Ohio v Clark*, 576 US 237, 237; 135 S Ct 2175; 192 L Ed 2d 306 (2015).

We concluded in our prior opinion that the primary purpose of SC's and EH's statements were not testimonial in nature, and that their admission did not therefore violate the Confrontation Clause. *Id.* Despite the statements having been made in a formal setting, they were made during the course of CPS investigations aimed at ensuring the safety of the minor declarants, and not to aid a police investigation. *Id.* at 392. We noted that this was particularly true "where the children were too young to understand the legal implications of their statements." *Id.* at 388. In reaching that conclusion, we gave a fairly extensive analysis of *Ohio v Clark*, 576 US 237; 135 S Ct 2175; 192 L Ed 2d 306 (2015), as well as a number of persuasive state and federal circuit cases issued post-*Clark* that endorsed "the principle that [out-of-court statements made by] very young children are unlikely to implicate the Confrontation Clause." *Id.* at 388-390. With specific regard to this case, we noted:

In this case, SC's statement was given to a CPS employee when SC was approximately three years old, and was being interviewed to determine if his father's home was fit for children. When SC was asked if he knew defendant, SC replied, "yeah, him [sic] choked me." SC then frantically repeated the accusation

a number of times while pointing to his neck. Similarly, EH's statement was given to a CPS employee during a forensic interview when she was three years old. The interviewer asked EH if she knew defendant, and she replied that she did. The interviewer then asked if there was "something that [defendant] does that [EH does not] like, does that sound right?" EH replied that defendant choked her. The interviewer asked if there was anything else defendant did that EH did not like, to which she replied that he "choked her siblings as well." With respect to EH, the CPS worker addressed a number of issues before ever asking if EH knew defendant, and it seems clear that the goal was to evaluate the ongoing emergency of abuse in the home and to protect EH. The same is true for SC: a CPS worker was interviewing SC to determine if his father's home was a safe environment for a child. The interviewers were never directly investigating defendant's involvement in BH's or JP's deaths, or attempting to extract testimony from the children. [*Id*. at 391-392.]

Thus, in light of the vacation of our previous opinion without reference to the confrontation issue, or without direction to reexamine that issue, we think it prudent to at least acknowledge that we would adopt the same analysis from our previous opinion with respect to that issue and reach the same conclusion: the trial court did not err in concluding that the out-of-court statements made by SC and EH and admitted at trial were nontestimonial in nature and that their admission did not violate the Confrontation Clause.[7]

---

[7] We should also note that we *elected* to address an issue "vaguely suggest[ed]" by defendant's brief in our prior opinion, which was that the prosecutor did not comply with MCL 768.27c(3) by providing defendant with notice of the hearsay statements at least 15 days before trial. *Id*. at 393. We explained that, indeed, the prosecutor's notice was untimely. *Id*. at 393-395. But, we found the error harmless, as "the evidence against defendant was overwhelming," and we were "not convinced that the admission of SC's and EH's statements was outcome-determinative." *Id*. at 395. We explained:

Testimony establishes that defendant was the only individual in the room when BH died, and the nine-day jury trial included testimony from six medical experts and written reports from seven medical experts that, for the most part, tended to show that BH's death was a homicide caused by blunt-force trauma. Evidence also suggested that defendant had a history of engaging in abusive conduct with his girlfriends and their children. Moreover, even without the statements of SC and EH, testimony from Dr. Kevin Durell and EH's mother indicated that both children at one point in time had petechiae on their faces—a sign consistent with being choked. Finally, defendant even admitted in a police interview to picking up BH, shaking him, and putting BH "back down on the bed harder than [he] should" have. There was no shortage of evidence against defendant in this case, and we cannot conclude that the failure to strictly comply

Affirmed.

                                             /s/ Colleen A. O'Brien
                                             /s/ Karen M. Fort Hood
                                             /s/ Thomas C. Cameron

---

with the disclosure provision of MCL 768.27c(3) was anything but harmless. [*Id.* at 395-396 (footnote omitted).]

As with the confrontation issue, our Supreme Court's remand order in this case did not mention this issue, nor has either party raised it in their supplemental briefs. We again simply note that we would reach the same result from our prior opinion with respect to MCL 768.27c(3).