

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00467-CR

Gary Franz **DEVAUGHN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-CR-11400
Honorable Ron Rangel, Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:    Beth Watkins, Justice
Liza A. Rodriguez, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: March 13, 2024

AFFIRMED

Appellant Gary Franz DeVaughn appeals his attempted aggravated sexual assault and aggravated assault with a deadly weapon convictions on confrontation and sufficiency grounds. We affirm.

## BACKGROUND

On March 4, 2020 at 11:06 p.m., Regina Anderson was stopped at a traffic light when she saw a naked and injured woman running towards her, trying to get in her car. Anderson did not admit the woman, later identified as R.W., but said she would call for help. Anderson called

9-1-1 and told the dispatcher that it looked like R.W. had been raped and beaten because she had bruises on her body and she was nude. She also said it looked like she had been stabbed because she saw blood on her body.

Police responded to the call and placed R.W. in the back of a patrol car and covered her in a blanket. Paramedics with the San Antonio Fire Department responded soon thereafter and placed R.W. on a stretcher and moved her to their ambulance. Patrol officer Ryan Matjeka joined R.W. in the back of the ambulance. His body camera captured the interaction between R.W. and paramedic Matthew Hartl. R.W. faced the front of the ambulance and could only see Hartl.

Hartl observed swelling to her right eye, contusions to both eyes, swelling and light discoloration to her face, and bite marks on her face and hand. R.W. reported she had a headache. She also had an elevated pulse, which Hartl attributed to her emotional state. He asked her what happened. She responded that she met a man, they rented a motel room, and after they drank some coffee and smoked some marijuana, he assaulted her and tried to rape her.

Hartl treated her nausea and vomiting and transported her to Metropolitan Methodist. Doctors there found a subdural hematoma and transferred her to the Brooke Army Medical Center for treatment. Dr. Nicholas Thompson was among her treating physicians at BAMC.

Before she was transferred to BAMC, R.W. told Matjeka that there might be evidence in Room 20 at the Alamo Inn & Suites. She said DeVaughn "ripped her clothes off," "tried to sexually assault her," "punched her in the face," "choked her," and grabbed her knife off the nightstand and threatened to kill her. R.W. also told him that because the latch was locked on the door, and DeVaughn prevented her from leaving, she escaped through the motel window. R.W. later described DeVaughn as "a tall black male with a prior military experience and a bad leg." She said he drove a "blue car with front-end damage and a rope strapped on the hood."

Matjeka and other officers went to the Alamo Inn where they found an obvious crime scene. Blood droplets outside Room 20 led towards the motel's front office. There was blood on the glass door to the office. The night manager told the officers that DeVaughn had rented the room and had left his license behind and gave them consent to search the room. The door to Room 20 had been left wide open and a damaged window screen lay on the ground. "There were clothes, undergarments. There was blood. There was human fecal matter on the floor." There was a "pile of stuff on the floor. There was vomit and signs that clearly a disturbance had occurred immediately prior to our arrival." Officers found a bone-handled knife on top of a microwave.

The next day, officers found DeVaughn's car at the address listed on his driver's license. They obtained a warrant and arrested him without incident. Detective Jose Rodriguez noticed an injury to DeVaughn's face and thumb and concluded they were caused by R.W.'s defensive maneuvers. A grand jury indicted DeVaughn on charges of attempted aggravated sexual assault with a deadly weapon and aggravated assault with a deadly weapon.[1] The indictment included a single enhancement allegation.

R.W. could not be found to be served with a subpoena, and she did not testify at trial. The trial court admitted State's Exhibits 4 (Hartl's Patient Care Report), 11 (Matjeka's body camera footage which recorded the conversation between R.W. and Hartl), and 37 (BAMC medical records) over DeVaughn's confrontation objections. The State's evidence also included a photograph of R.W. in the hospital, testimony from Hartl, Matjeka, and Thompson about their interactions with R.W., and video surveillance footage from the Alamo Inn. That footage captured

---

[1] The grand jury also indicted DeVaughn on a charge of attempted sexual assault, and the jury found DeVaughn guilty of that charge. At the sentencing hearing before the trial court, the State conceded the offense was as a lesser included offense of the attempted aggravated sexual assault, and the trial court did not assess punishment for it. That conviction is not at issue in this appeal.

DeVaughn's car and R.W.'s truck pulling into the motel, and a naked R.W. later walking towards the front office and banging on the office door while DeVaughn drove away.

Through cross-examination of witnesses and closing argument, DeVaughn's defensive theory was that after he and R.W. smoked marijuana and drank coffee, he fell asleep on a chair in the motel room and awoke to R.W. rifling through his pockets and stealing his cash, which led to an altercation. He argued he had "no specific intent to commit a sexual assault, no intent to commit an aggravated assault, never exhibited the knife."

The jury found DeVaughn guilty; the trial court found the enhancement allegation true, sentenced him to 70 years on each count, and ordered the sentences to run concurrently.

**ANALYSIS**

*Confrontation*

In his first argument on appeal, DeVaughn argues the trial court erred in admitting State's Exhibits 4, 11, and 37 over his confrontation objections. DeVaughn acknowledges that the statements contained in these exhibits "would normally be admissible under the medical diagnosis exception," but argues R.W.'s statements about the assault contained within them were testimonial. According to DeVaughn, "any ongoing emergency had ended" by the time R.W.'s statements were recorded in Exhibits 4, 11, and 37, R.W. "was passing through town with no real intention of returning to testify," and therefore intended to "memorialize the possible crime for use against DeVaughn in a later prosecution." The State responds that the statements are nontestimonial—made for medical treatment and in response to an ongoing emergency.

*Applicable Law*

The Sixth Amendment "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (internal quotation

marks omitted). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*; *see Langham v. State*, 305 S.W.3d 568, 579 (Tex. Crim. App. 2010) ("[B]y 'primary purpose,' the Supreme Court in *Davis* meant the 'first in importance' among multiple, potentially competing purposes.").

The primary purpose inquiry requires a court to consider all relevant circumstances. *Michigan v. Bryant*, 562 U.S. 344, 369 (2011). These include whether an ongoing emergency exists (to the relevant "zone of potential victims"), whether questioning is to determine past fact or an ongoing event, whether the interrogation is formal or informal, and reliability of the statements as informed by the rules of evidence. *Clark*, 576 U.S. at 244–45; *Bryant*, 562 U.S. at 363. We look "to the contents of both the questions and the answers" to ascertain the primary purpose. *Bryant*, 562 U.S. at 367–68. "[S]tatements to individuals who are not law enforcement officers could conceivably raise confrontation concerns" but "such statements are much less likely to be testimonial than statements to law enforcement officers." *Clark*, 576 U.S. at 246.

"In the end, the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Id.* at 245 (internal quotation and alteration marks omitted). "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at 359. We review de novo a constitutional legal ruling on whether a statement is testimonial or not. *Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006).

*Application*

1.    State's Exhibit 4 (Paramedic Hartl's Patient Care Report)

The prosecutor asked Hartl about his Patient Care Report, including the narrative that, "Patient stated that she was assaulted by a black male. Patient stated the male also tried to sexually assault her but he was unsuccessful due to the patient biting the male."

First, R.W. made the statement to a paramedic rather than a law enforcement officer, so it is "much less likely to be testimonial." *Clark*, 576 U.S. at 246. Although Hartl testified that he was part of a "specs ops unit" that worked closely with law enforcement and carried ballistic gear, his interaction with R.W. was part of a regular "trauma run" requiring "paramedic level type care" and transport to a hospital.

Second, an ongoing emergency existed in that an unknown assailant had not yet been identified or apprehended. Officer Matthew Bennett performed a protective sweep of the motel room in part because "without going through the door I could observe that there was a bloody knife so there might be somebody stabbed, there might be a suspect who has hurt somebody or is dangerous to the rest of us that we need to detain immediately." *See Bryant*, 562 U.S. at 359, 364–65 (finding ongoing emergency where—"victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim," given potential threat to responding officers and public).

Third, while Hartl questioned R.W. to determine a past—rather than an ongoing—event, the primary, "'first in importance' among multiple, potentially competing purposes" of the questioning was to determine appropriate emergency assistance. *Langham*, 305 S.W.3d at 579; *Davis*, 547 U.S. at 822. Hartl described his role as "strictly medical." Hartl testified that patients' ability to answer questions informs the determination whether "we can proceed using their info to

treat them" and which hospital to transport them to, if any. That is, the description of the cause of injury patients reveal helps with assessment of the patient and treatment.

Fourth, the questioning was informal, in the back of an ambulance, while treating R.W. *Clark*, 576 U.S. at 245 ("A 'formal station-house interrogation,' like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused.").

Fifth, R.W. spoke out of a need for medical treatment, and statements made for purposes of medical treatment are generally viewed as trustworthy because the declarant has an interest in being truthful so that appropriate medical treatment is provided. *Bryant*, 562 U.S. at 358–59 ("In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant.").

Objectively, the Patient Care Report is more like a medical record created for treatment than a forensic report created for prosecution. *Cf. Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308, 311, 312 n.2 (2009) (affidavits reporting results of forensic analysis are testimonial, while medical reports created for treatment purposes are generally not); *see Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd). We therefore hold that the admission of R.W.'s statements to Hartl in the ambulance, as recorded in the Patient Care Report, did not violate the Confrontation Clause because the primary purpose of the conversation was to evaluate and treat injuries rather than to establish past facts for trial. *Davis*, 547 U.S. at 822; *Langham*, 305 S.W.3d at 579.

2.      State's Exhibit 11 (Footage From Officer Matjeka's Body-Worn Camera)

Officer Matjeka's body-worn camera captured Hartl's interaction with R.W. In the video, R.W. is not facing the camera and only her covered body is visible. However, Hartl is visible and is attending to R.W. throughout the interaction.

In the unmuted portion played for the jury, Hartl asked R.W. a series of questions to determine what happened. R.W. explained she and her three dogs were living out of her truck. She further told Hartl:

- "I was camping out at a spot and got asked to leave, so I went into town, and I was at a Dollar Store at Martin Luther King Jr. Plaza, and I met someone there, and I told him what had happened, and they said that they could get a room and I could stay there, and we could have a cup of coffee."

- "I made some coffee. He went to go get some grass. He came back, we were outside, we smoked some grass together. Then we went inside, and he assaulted me."

- "He was choking me; he was trying to rape me."

- "He has a really bad limp on his righthand side."

- "He had me down on the ground and he was choking me and hitting me in the face."

For the same reasons outlined above, we find R.W.'s statements to Hartl, as captured on Matjeka's body-worn camera, nontestimonial. *Clark*, 576 U.S. at 245; *Davis*, 547 U.S. at 822.

3.     State's Exhibit 37 (BAMC medical records)

State's Exhibit 37 consists of BAMC records "dated 04 MAR 2020 - 20 AUG 2021 for a total of 224 pages regarding [R.W.]."

Initially, we address the State's argument that DeVaughn failed to preserve this issue by failing to direct the trial court to the portions of the large exhibit that he thought objectionable. DeVaughn specifically objected to any reference to an assault within the records. He also objected specifically on confrontation grounds to "[a]nything past the emergency room." The State responded that the statements R.W. made to those treating her at BAMC were "made for the purposes of medical diagnosis. Exception to the hearsay rule, also nontestimonial." The State brought the trial court's attention to a tabbed page in the records and referenced it as page "4 of

11." The page contains narratives from an emergency medicine intern and Dr. Thompson. Both reference the assault and the attempted rape:

- "Patient is a 55-year-old female presenting for evaluation after assault. . . . Denied any penetration during attempted sexual assault that would necessitate STI treatment. Patient to be admitted to surgery."

- "50ish yo female bib EMS from Methodist after being assaulted and found to have a right tentorial SDH and edema around the right eye and face. Patient states it was an attempted sexual assault but denies any vaginal/anal penetration. . . . Patient reportedly was bitten and received Augmentin at OSH, Keppra, and Tdap. Patient admitted to the trauma team in stable condition."

The trial court asked DeVaughn if the tabbed page was what he was "making reference to" in his argument, and counsel replied, "Yes, Your Honor. And that's mentioned several times, yes. And then the testimony that would be elicited." The trial court overruled the objections. DeVaughn again objected when the prosecutor asked Dr. Thompson about page "4 of 11," the prosecutor again responded that the statements were not testimonial, and the trial court again overruled the objection. We find the multiple objections sufficient to preserve any Confrontation Clause error with regard to the references to the assault in the medical records. *Thomas v. State*, 408 S.W.3d 877, 884–85 (Tex. Crim. App. 2013) ("So long as it appears from an appellate record that [preservation] policies have been satisfied, it should not matter to the appellate court whether the objecting party used a particular 'form of words'—or any particular words at all, if meaning is adequately conveyed by context.").

Turning to the merits, the record reveals that the State asked Thompson about specific parts of the exhibit. Thompson testified that they ran "a urine test for gonorrhea and chlamydia," which is something they do "if there's any concern for the possibility of a sexual assault." He also testified about "page 4 of 11." He testified that R.W. was "transferred to us after she was found to have what's called a right tentorial subdural hematoma as well as swelling around her right eye and

face." And "what she reported was an attempted sexual assault but denied any actual sexual penetration." "She reported to us that she was bitten during the assault" and he saw the evidence of that, so she was given "an antibiotic that we use to treat human bites." Thompson also stated that she was seen in "one of the facial trauma clinics a few days later" because "she also had nasal bone fractures." Thompson explained that a patient's "history first and foremost kind of -- as well as our physical exam -- guides what kind of workup we're going to do on the patient."

Like R.W.'s statements to Hartl, her statements recorded in the BAMC records reflect that they were made to hospital personnel for the primary purpose of ascertaining appropriate medical treatment. *Clark*, 576 U.S. at 245; *Davis*, 547 U.S. at 822. Accordingly, we conclude those statements were nontestimonial.

We overrule DeVaughn's confrontation issues.

### *Sufficiency*

DeVaughn next argues the evidence is insufficient to prove he used or exhibited the knife found in the motel room as a deadly weapon because the State did not conduct any forensic analysis on the knife. He also points to the fact that R.W. had no cutting wounds and the State failed to present testimony about the knife's sharpness or life-threatening capabilities, how far away DeVaughn was from R.W., or what words DeVaughn spoke to her when he allegedly wielded it.

#### *Applicable Law and Standard of Review*

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). "A knife is not a deadly weapon per se." *Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983). "In determining whether a weapon is deadly in its manner of use or intended manner of use, the defendant need not have actually inflicted harm on the victim." *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017). "Instead, we consider words and other threatening actions by the

defendant, including the defendant's proximity to the victim; the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon; and the manner in which the defendant used the weapon." *Id*. "These, however, are just factors used to guide a court's sufficiency analysis; they are not inexorable commands." *Id*.

"When reviewing the record for legal sufficiency, we consider the combined and cumulative force of all admitted evidence and reasonable inferences therefrom in the light most favorable to the verdict to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt." *Id*. at 322 (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). "In applying the *Jackson* sufficiency review, an appellate court *must consider all evidence* which the jury was permitted, whether rightly or wrongly, to consider." *Moff v. State*, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004) (internal quotation marks omitted) (emphasis in orig.).

*Application*

Although the initial call to help R.W. came in as a "cutting" or "stabbing," no witness testified that R.W. had stab wounds. The BAMC medical records reflect the mechanism of injury as "Blunt Assault" and the box for "Stabbing" is left unchecked.

But the gaps in evidence that DeVaughn points to do not render the evidence insufficient. *See Johnson*, 509 S.W.3d at 323–24. Officer Matthew Bennett, who responded to the motel room, testified "Even without going through the door I could observe that there was a bloody knife[.]" Photos of the knife were admitted into evidence. The photographs depict a knife with a bone handle and a curved and notched blade, like a hunting knife. It has a smear of what appears to be blood on the side of the blade. The knife is on top of a microwave stand that had been pushed aside from the window R.W. left through. Defense counsel described the knife as a "lock-blade knife, pretty ugly knife[.]" Even without testimony, the jury could judge for itself the knife's characteristics. *See id*. at 324; *cf. Robertson v. State*, 163 S.W.3d 730, 733–34 (Tex. Crim. App. 2005). And, over

DeVaughn's objection—and to rebut his theory of defense—Matjeka testified that R.W. told him that when she was trying to leave, DeVaughn grabbed her "knife and threatened to kill her." From the photographs and Matjeka's testimony, the factfinder could have rationally concluded that DeVaughn wielded the knife during the criminal transaction to threaten deadly force. *Johnson*, 509 S.W.3d at 323–24; *Moff*, 131 S.W.3d at 488. We overrule DeVaughn's sufficiency complaints.

## CONCLUSION

Having overruled each of DeVaughn's issues on appeal, we affirm the judgment of the trial court.

Beth Watkins, Justice

DO NOT PUBLISH