23CA0903 Peo v Zumaran 05-15-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0903
Jefferson County District Court No. 22CR1453
Honorable Diego G. Hunt, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Alfredo Zumaran,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE SCHOCK
Dunn and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 15, 2025

---

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Hana Alicic, Deputy State Public Defender, Golden, Colorado, for Defendant-Appellant

¶ 1     Defendant, Alfredo Zumaran, appeals his convictions for third degree assault and harassment.  He contends that the district court reversibly erred by allowing a forensic nurse examiner (FNE) to testify about statements the victim made to her, in violation of the Confrontation Clause and the rule against hearsay.  We affirm.

## I.     Background

¶ 2     The charges in this case stem from Zumaran's physical altercation with his girlfriend (the victim) in the parking lot of his apartment complex.  Zumaran's neighbor witnessed the incident and testified at trial.  According to the neighbor, Zumaran pushed the victim to the ground, grabbed her phone from her hand, and threw it.  About ten minutes later, Zumaran stood over the victim as she sat on the curb, "making moves like he was going to punch her."  He then grabbed her around her neck and dragged her "[a] few feet" across the parking lot, holding one or both of his hands around her neck for a minute or longer.  The neighbor called 911.

¶ 3     When police arrived, the victim had a lump on the back of her head; a missing fingernail; and marks on her neck, arm, and chest.  Zumaran told the police the victim had thrown his car keys at him, and he responded by taking her phone from her.  Zumaran claimed

1

that he and the victim had then fallen to the ground while wrestling over the phone and that he did not intend to harm her.

¶ 4 The police took the victim to the hospital where she was examined by the FNE. The victim told the FNE she had a headache and neck pain and felt like there was mucus in her throat. She attributed the neck pain to being strangled from behind by one hand and an arm, "like a chokehold."

¶ 5 Zumaran was charged with second degree assault, robbery, third degree assault, harassment, criminal mischief, and obstruction of telephone service. The second degree assault charge was based on the alleged strangulation, *see* § 18-3-203(1)(i), C.R.S. 2024, while the third degree assault and harassment charges alleged more generally that Zumaran had "caused bodily injury" to the victim and unlawfully "subjected [the victim] to physical contact," *see* §§ 18-3-204(1)(a), 18-9-111(1)(a), C.R.S. 2024.

¶ 6 The victim did not respond to a subpoena for trial. So the prosecution sought to introduce her statements through the FNE. The prosecution requested a pretrial ruling on the admissibility of testimony from the FNE relaying the victim's statements "about her medical state, past and present symptoms, pain or sensations, or

[their] inception or cause." The prosecution argued those statements were nontestimonial and admissible under CRE 803(4) because they were made for purposes of medical diagnosis and treatment. Zumaran objected, asserting that the admission of the statements would violate his constitutional right of confrontation.

¶ 7     Before ruling on the issue, the district court questioned the FNE outside the presence of the jury. The FNE testified that she was a registered nurse who had been "trained to provide forensic exams and provide comprehensive care to victims . . . of crime." She explained that those two roles were "kind of meshed together," in that the victim's statements helped guide both her evidence collection and nursing diagnosis. Evidence collection involves "swabbing of different areas on the body" and taking photographs of the person's injuries, while providing care entails examining the person for bruises, abrasions, or other conditions that are "outside [the FNE's] scope" and require intervention by another provider. The person being examined must sign a form consenting to the exam and to the release of the exam's findings to law enforcement.

¶ 8     The FNE explained that the victim's statement that she had been strangled required a referral to the emergency department for

further evaluation. Based on that statement, the FNE conducted a "detailed examination" of the victim's face, chin, and neck and asked the victim about her symptoms, whether she had lost consciousness, and how many times she had been strangled. The FNE then relayed that information to the emergency department doctor so they could "do their own physical assessment and develop a treatment plan." The FNE also documented the victim's other statements — including that her arm had been pushed until it felt like it would break, that she had been pushed to the ground, and that she had been threatened with a knife — on a forensic chart. Those statements did not prompt any further medical care.

¶ 9 The FNE testified that the victim's statements helped her treat and diagnose the victim. In particular, they helped her identify "potential injuries, signs and symptoms of injuries," as well as "where to swab" and what parts of the body to photograph. She clarified that the photos and swabs were taken for evidence collection, while the statements were used for the treatment plan.

¶ 10 After hearing the FNE's testimony, the district court ruled that the victim's statements to the FNE concerning the alleged strangulation — including the fact that she was strangled and the

4

associated symptoms — were admissible because they "inform[ed] the [FNE's] decision to refer the matter for further treatment by the emergency department" and, thus, "were specifically for diagnosis." But the court excluded other statements about the assault because "that information was simply documented for forensic purposes."

¶ 11     The FNE testified before the jury on direct examination that the victim told her she "had a headache and neck pain and . . . felt like there was mucus in her throat." She further testified that the victim said she had gotten the neck pain from being "strangled."

¶ 12     On cross-examination, defense counsel asked the FNE if the victim had told her that "two hands were used" in the strangulation or that "the suspect approached from the front." The prosecution argued these questions opened the door to further examination about how the victim was strangled. Without addressing that argument, the district court clarified that any statements the victim made to the FNE about the manner of strangulation were admissible because they were "pertinent to the diagnosis" and referral of the victim to the emergency department for treatment.

¶ 13     Defense counsel then clarified with the FNE that the victim had reported that she had been strangled with "one hand and one

arm" and had been "approach[ed] from behind."  On redirect, the FNE elaborated that the victim said it was "like a chokehold."

¶ 14     The jury found Zumaran not guilty of second degree assault (strangulation), robbery, and obstruction of telephone service.  It found Zumaran guilty of third degree assault and harassment.[1] The court sentenced Zumaran to eighteen months of probation.

## II.     Confrontation Clause

¶ 15     Zumaran first contends that the FNE's testimony recounting the victim's statements violated his constitutional confrontation right because the statements were testimonial.  We disagree.

### A.     Applicable Law and Standard of Review

¶ 16     The Confrontation Clauses of the United States and Colorado Constitutions guarantee criminal defendants the right to confront the witnesses against them.  U.S. Const. amend VI; Colo. Const. art. II, § 16; *see also Nicholls v. People*, 2017 CO 71, ¶ 31 (noting that Colorado's Confrontation Clause is interpreted "commensurate with the federal Confrontation Clause").  Under these clauses, the testimonial statements of a nontestifying witness are inadmissible

---

[1] The prosecution dismissed the criminal mischief charge after it rested its case and before closing arguments.

unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine them. *People v. Garcia*, 2021 CO 7, ¶ 8. Statements that are not testimonial do not implicate the Confrontation Clause. *See People v. McFee*, 2016 COA 97, ¶ 33.

¶ 17 A statement is testimonial when, "in light of all the circumstances, viewed objectively, the 'primary purpose' of [procuring the statement] was to 'creat[e] an out-of-court substitute for trial testimony.'" *Garcia*, ¶ 9 (quoting *Ohio v. Clark*, 576 U.S. 237, 245 (2015)). In determining a statement's primary purpose, we examine its primary purpose when it is made, not when it is introduced at trial. *Id.* at ¶ 10. And we look to "the purpose that a reasonable declarant in those circumstances would have had, rather than the declarant's subjective or actual purpose." *McFee*, ¶ 37. Relevant considerations may include the existence of an ongoing emergency, the formality or spontaneity of the statements, the environment in which the statements were made, and the identity of the person to whom the statements were made. *Id.*

¶ 18 We review de novo whether the admission of evidence violated the Confrontation Clause. *People v. Perez*, 2024 COA 94, ¶ 11.

## B.  Analysis

¶ 19    We agree with the district court that the victim's statements to the FNE about the strangulation and her associated symptoms were not made for the primary purpose of creating a substitute for trial testimony.  *See Garcia*, ¶ 9.  Instead, viewed from the perspective of a reasonable declarant in the victim's position, the purpose of those statements was to facilitate medical diagnosis and treatment.

¶ 20    As the supreme court has recognized, forensic medical exams serve dual medical and investigative purposes.  *Teague v. People*, 2017 CO 66, ¶¶ 10, 13.  They are both a "valuable tool for collecting . . . evidence" *and* a "patient-centered medical procedure" providing "comprehensive care for victims."  *Id.* at ¶¶ 2, 12.  The FNE's testimony in this case confirmed that her exam served that dual role.  In such a scenario, a court should "distinguish[] between those aspects of the examination which were diagnostic in nature and those aspects which could arguably be labeled investigatory."  *People v. Vigil*, 127 P.3d 916, 924 (Colo. 2006); *see also United States v. Norwood*, 982 F.3d 1032, 1045, 1049-50 (7th Cir. 2020) (explaining that, in assessing statements made during a "part-

medical, part-forensic examination," courts should parse the testimonial statements from the nontestimonial statements).

¶ 21    The district court did that. Importantly, it admitted only the victim's statements about the strangulation and its associated symptoms. It did not admit statements about other aspects of the assault that did not result in injuries or require medical care — including that Zumaran had pushed the victim's arm into the steering wheel, held a knife to her throat and face, and threatened to "mess up her face." Nor did any of the statements identify Zumaran by name. *See Vigil*, 127 P.3d at 924 (noting that a victim's statements naming the defendant were inadmissible because the assailant's identity was "immaterial to the doctor's opinion"); *People v. Jones*, 313 P.3d 626, 636 (Colo. App. 2011), *rev'd on other grounds*, 2013 CO 59 (holding that statements were nontestimonial where they did not include "any identifying information about [the victim's] assailant or details of the assault").

¶ 22    As to the strangulation-related statements, the circumstances objectively indicated a medical purpose rather than an investigative one. The FNE testified that she used the information about the victim's symptoms to form a "nursing diagnosis" and that those

9

symptoms were "consistent with strangulation." She also explained that when a victim says they have been strangled, the "protocol" is to refer the victim to another medical provider for further evaluation, which she did in this case. In addition to that referral, the victim's statement that she had been strangled prompted a "detailed examination" and further questions about what "signs and symptoms" she had experienced — information the FNE relayed to the other provider for use in developing a treatment plan.

¶ 23 The manner of strangulation was likewise reasonably pertinent to that diagnosis and treatment. *See Jones*, 313 P.3d at 636 (holding that victim's statement that "her assailant had caused her neck and jaw pain by holding her mouth closed" was made for purposes of medical diagnosis and treatment). For example, the FNE testified that strangulation may occur either by "blocking off the trachea" and cutting off air flow, or by "blocking the jugular veins and carotid arteries" and cutting off blood flow. She further explained that the different forms of strangulation may result in different injuries. Thus, the record indicates that the victim's statements regarding the alleged strangulation — both that it

occurred and how it occurred — could, and did, directly influence the FNE's diagnosis and treatment recommendations.

¶ 24 The circumstances would also have led a reasonable declarant in the victim's position to expect that her statements would be used for a medical purpose rather than as a substitute for trial testimony. Most starkly, she made those statements to a nurse at a hospital, in response to questions about her symptoms and injuries. *See McFee*, ¶ 37 (noting relevance of the "identity of the person to whom the statements were made" and "the environment in which the statements were given"); *Clark*, 576 U.S. at 246 (holding that statements to persons who are not law enforcement officers are "much less likely to be testimonial than statements to law enforcement officers"). Even if the FNE was working with law enforcement, that setting would not reasonably have indicated to the victim that the FNE was "principally charged with uncovering and prosecuting criminal behavior." *Clark*, 576 U.S. at 249.

¶ 25 Moreover, by the time the victim spoke with the FNE, she had already told police what had occurred, including that Zumaran had "used a 'choke hold' to strangle [her]." She therefore had no reason to repeat that information to the FNE for a testimonial purpose.

11

Instead, the different context of these statements suggested a different purpose — namely, a medical one. *See Jones*, 313 P.3d at 636 (holding that a victim's statements to a triage nurse about why she was at the hospital were not testimonial when she had already given a detailed description of the assault to a police officer).

¶ 26 Considering all the circumstances, we view the admitted statements in this case as similar to those deemed nontestimonial in *Vigil* and *Jones*. Both cases involved statements made by a victim during the course of a sexual assault examination. *Vigil*, 127 P.3d at 922-23; *Jones*, 313 P.3d at 636. In both cases, the court concluded that the statements in question were not testimonial because the victims made them to help medical personnel diagnose and treat their injuries — even if *other* statements made during the course of the examination had an investigative purpose. *See Vigil*, 127 P.3d at 924-26; *Jones*, 313 P.3d at 636. Similarly, the primary purpose of the victim's statements to the FNE about the strangulation was to allow medical personnel to diagnose and treat her potential injuries, not to develop evidence for trial.

¶ 27 Zumaran attempts to distinguish *Vigil* and *Jones* by arguing that, unlike those cases, the victim's examination was completed at

the behest of law enforcement, who brought her to the hospital and were "in and out of the room" during the examination. *Cf. Vigil*, 127 P.3d at 924 (noting that the police officer was not in the room when the doctor performed the examination). He also points out that the victim was advised of the FNE's evidence-gathering role and signed a form agreeing to the release of information to law enforcement.

¶ 28 But although these circumstances might reasonably have indicated that *portions* of the examination were for gathering evidence — as the FNE acknowledged — what matters is the purpose of the specific statements at issue. *See id.* at 923-24 ("The fact that the doctor was a member of a child protection team does not, in and of itself, make him a government official . . . ."). And in this regard, the statements about strangulation were unique in that they triggered a particular treatment and referral "protocol."

¶ 29 We are also unpersuaded by Zumaran's contention that the statements are testimonial because they were not made during an ongoing emergency. The existence of an ongoing emergency is one relevant consideration, particularly with respect to statements made to law enforcement. *McFee*, ¶ 37; *see also State v. Burke*, 478 P.3d 1096, 1110 (Wash. 2021) ("The existence of an ongoing emergency

13

is often an indicator that a statement to *law enforcement* (or its agents) is nontestimonial."). But it is "not the touchstone of the testimonial inquiry." *Michigan v. Bryant*, 562 U.S. 344, 374 (2011). When statements are made to someone other than law enforcement, there may be many nontestimonial purposes beyond addressing an ongoing emergency, one of which may be to obtain proper medical care. *Burke*, 478 P.3d at 1110-11; *see also Vigil*, 127 P.3d at 926.

¶ 30     We agree with the district court that the victim's statements to the FNE concerning the alleged strangulation and her associated symptoms were made primarily for that medical purpose. We therefore conclude that they were not testimonial, and their admission did not violate the Confrontation Clause.

### III.   Hearsay

¶ 31     Zumaran also argues that the victim's statements to the FNE were inadmissible hearsay that did not satisfy the medical purpose hearsay exception. This argument dovetails with Zumaran's Confrontation Clause argument, and we reject it for similar reasons.

A.      Applicable Law and Standard of Review

¶ 32      Hearsay — an out-of-court statement offered to prove the truth of the matter asserted — is generally inadmissible unless it satisfies one of the enumerated exceptions.  CRE 801(c); CRE 802.

¶ 33      One such exception is for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."  CRE 803(4).  Such statements are presumed reliable because of a patient's belief that effective treatment depends on the accuracy of information provided to a medical professional.  *People v. Tyme*, 2013 COA 59, ¶ 9.

¶ 34      Under this exception, a statement made as part of a forensic medical examination is admissible if (1) the statement is reasonably pertinent to treatment or diagnosis, and (2) its content is such as is reasonably relied on by a physician in treatment or diagnosis.  *Id.* at ¶ 16.  Such statements are not admissible if the surrounding facts and circumstances "give rise to an inference that the forensic examination or interview had no medical or diagnostic characteristic, but was rather purely investigative."  *Id.* at ¶ 17.

15

¶ 35    We review the district court's evidentiary rulings for an abuse of discretion. *Id.* at ¶ 8. A district court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

## B.    Analysis

¶ 36    The victim's statements to the FNE described her "present symptoms, pain, or sensations" and the "inception or general character of the cause or external source thereof." CRE 803(4). Thus, their admissibility turned on whether they satisfied the two-part test set forth in *Tyme*. We conclude that the district court properly exercised its discretion in determining that they did.

¶ 37    First, for the reasons set forth above, the FNE's testimony established that the statements regarding strangulation were "reasonably pertinent to treatment or diagnosis." *Tyme*, ¶ 16. As part of her care-providing function, the FNE needed to know what symptoms the victim was experiencing so she could properly assess those conditions and determine if additional treatment was necessary. *See People v. Abdulla*, 2020 COA 109M, ¶¶ 82, 87.

¶ 38    And the fact that the symptoms had resulted from being strangled — and the manner of strangulation — was medically pertinent as well. The FNE explained that the victim's report of

16

having been strangled informed the treatment and diagnosis by leading her to (1) conduct a "detailed examination" of the victim's face, chin, and neck; (2) ask a series of follow-up questions about loss of consciousness and other symptoms; and (3) refer the victim to another provider for further evaluation. *See Tyme*, ¶ 20 (holding that the first prong of the CRE 803(4) test was satisfied when nurse examiner testified that she relied on the statement to "guide her examination and used it 'to diagnose and treat'" the victim).

¶ 39 Second, the reasonableness of the FNE's reliance on the statements is reflected in her testimony that a referral for further evaluation is "protocol" for strangulation. *See id.* (holding that testimony that nurse examiners "normally rely" on similar statements to guide diagnosis and treatment satisfied second prong of test). In other words, it was not simply the FNE's subjective determination that the strangulation required referral to another provider for further evaluation. That was the standard procedure.

¶ 40 Echoing his Confrontation Clause argument, Zumaran contends that the statements do not satisfy CRE 803(4) because the victim did not request medical treatment, and thus, the exam was purely investigatory. But "a declarant may make a statement for

17

medical diagnosis or treatment purposes, even if the primary purpose of the exam is forensic." *Tyme*, ¶ 14. And the record supports the district court's determination that although the victim did not affirmatively seek out medical treatment, her statements about the strangulation had a diagnostic or treatment objective — even if other statements she made about the assault did not.

¶ 41 It is also immaterial that the FNE did not provide treatment for the strangulation herself. Statements made to determine "the nature, source, or cause of a patient's medical condition" may satisfy CRE 803(4), regardless of whether they ultimately lead to treatment. *Kelly v. Haralampopoulos*, 2014 CO 46, ¶ 24; *see also Tyme*, ¶ 19 (rejecting argument that CRE 803(4) did not apply because the victim had already been treated by a physician and the nurse examiner did not provide any follow-up treatment).

¶ 42 Thus, we conclude that the district court did not abuse its discretion in allowing the FNE to testify about the victim's statements regarding the alleged strangulation under CRE 803(4).

## IV. Harmlessness

¶ 43 Because we conclude that the district court did not err in admitting testimony about the victim's statements in question, our

analysis could stop there. But even if we were to conclude otherwise, any error would be harmless given Zumaran's acquittal on the strangulation charge and the testimony of the eyewitness.

¶ 44 We review a preserved Confrontation Clause violation for constitutional harmless error, meaning we will reverse unless the error was harmless beyond a reasonable doubt. *McFee*, ¶ 28. We review an erroneous evidentiary ruling for nonconstitutional harmless error and will reverse if there is a "reasonable possibility that [the error] contributed to the defendant's conviction." *Abdulla*, ¶ 62 (citation omitted). Under either standard, any error in admitting the victim's statements would be harmless.

¶ 45 As noted above, the statements at issue related only to the alleged strangulation that was the basis of the second degree assault charge. But the jury acquitted Zumaran on that charge. Thus, the jury apparently did not accept the victim's statements that she had been strangled — at least not within the meaning of section 18-3-203(1)(i). *See Abdulla*, ¶ 92 (holding that hearsay statements "appear[ed] not to have had an impact on the jury" when the jury acquitted the defendant of sexual assault). And regardless, Zumaran was not prejudiced as to that charge.

19

¶ 46    To the extent Zumaran argues that the victim's statements related to strangulation contributed to his conviction on the other charges, we disagree for two reasons.  First, those charges were not premised on the alleged strangulation.  The prosecutor explained in closing argument that the third degree assault was "not the strangulation charge" and argued that the requisite bodily injuries for that charge were the victim's broken fingernail, bruises, and abrasions.  The prosecutor argued that the harassment charge was proved through the bruises and abrasions, as well as the neighbor's testimony that Zumaran "grabb[ed] [the victim] by her hair and dragg[ed] her through that parking lot and shov[ed] her to the ground."  And defense counsel conceded in closing that Zumaran's admitted act of grabbing the victim's wrist could constitute harassment.  The victim's statements to the FNE that were admitted at trial did not address any of this other conduct.

¶ 47    Second, even if the third degree assault and harassment convictions could have been based on the strangulation or "chokehold," the victim's statements were cumulative of the more detailed testimony from the neighbor eyewitness.  The neighbor testified that Zumaran held "one or two hands" around the victim's

neck for "a minute . . . [m]aybe longer."  The victim's statement that "she was strangled . . . [l]ike a chokehold" added little, if anything, to the neighbor's testimony effectively saying the same thing.

¶ 48    Thus, (1) Zumaran was acquitted of the charge directly tied to the challenged statements; (2) those statements were cumulative of other testimony; (3) the prosecution did not rely on the statements to prove the charges for which Zumaran was convicted; and (4) the evidence of those charges was substantial, consisting of photos of the victim's injuries and eyewitness testimony.  Under these circumstances, we are confident that "the guilty verdict actually rendered in this trial was surely unattributable" to the victim's statements to the FNE.  *McFee*, ¶ 48 (citation omitted).

## V.    Disposition

¶ 49    The judgment is affirmed.

JUDGE DUNN and JUDGE BROWN concur.

21